No. 65,556

STATE *ex rel.* M. DOUGLAS MAYS, SECURITIES COMMISSIONER of the STATE OF KANSAS, *Appellee,* v. LINDA RIDENHOUR, *et al., Defendants,* and BOB DECKER, *et al., Appellants.*

(811 P.2d 1220)

Opinion
filed May 24, 1991.

*Steve R. Fabert*, of Fisher, Patterson, Sayler & Smith, of Topeka, argued the cause and was on the briefs for appellants.

*Roger N. Walter*, general counsel for the Office of Securities Commissioner, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is an action brought by the plaintiff, Securities Commissioner of the State of Kansas (Commissioner), seeking equitable relief against the defendants under the provisions of the Kansas Securities Act, K.S.A. 17-1252 *et seq.* The defendants appeal from an order of the district court granting the plaintiff summary judgment and ordering the disgorgement of profits.

The Commissioner filed a civil suit in the Shawnee County District Court, alleging that some defendants, none of whom is appealing here, organized a "pyramid scheme" and that the appealing defendants materially aided in the operation of the scheme. Under K.S.A. 17-1266, the Commissioner is authorized to bring civil actions seeking equitable relief to enforce the Kansas Securities Act. The petition alleged violations of (1) K.S.A. 17-1255, which prohibits selling unregistered securities, (2) K.S.A. 17-1254, which requires securities salespersons to register, and (3) K.S.A. 17-1253, which prohibits material misstatements of fact in selling securities. The petition sought a mandatory injunction, the disgorgement of profits, the appointment of a receiver, and the production of records to allow an accounting.

After completing discovery, the Commissioner filed a motion for summary judgment on September 1, 1989, alleging violation of K.S.A. 17-1255. Defendants filed their response and motion for summary judgment on October 20, 1989. Defendants' only response to the statement of facts contained in the Commissioner's motion was to contest use of the term "actively solicited others," arguing that this was a legal issue to be resolved by the court.

The trial court adopted the Commissioner's statement of facts in its entirety, as follows:

"1. During November and December of 1986, an individual named Lynn Ridenhour introduced a multi-level sales program to residents of Shawnee County and surrounding areas. This was done through meetings or seminars held at the Holiday Inn and Ramada Inn in downtown Topeka and at private residences located in and surrounding Shawnee County, Kansas.

"2. The program was called the Top Flight Success System ('TFSS'). The TFSS program was marketed by Ridenhour on behalf of Products Management Corporation ('PMC'), an Oklahoma corporation. PMC was organized in 1976 but remained inactive until October of 1986. Prior to 1986, Ernest Mullenax was president and a director of PMC. Mullenax's wife, Margaret, was an original incorporator of PMC. Subsequent to October, 1986, Ridenhour was vice-president, Mullenax was director, and both were control persons of PMC.

"3. Participants joined the program by paying a $1500 entry fee. Payment of the fee entitled the payor to have his/her name placed on a chart in an entry level position as a 'passenger.' The charts consisted of four levels organized in a pyramid fashion. At the base of the pyramid were eight positions called 'passengers.' Above this in ascending order were four positions as 'crewmen,' two positions as 'co-pilots,' and one position as a 'pilot' at the apex. The system was metaphorically referred to as an airplane pyramid. Once eight passengers paid their money ('boarded the airplane'), the pilot cashed out, and the remaining participants split into two new pyramids with everyone advancing one level. Each new airplane in turn recruited eight new passengers, in which event the pyramids again multiplied. Theoretically, the process continued ad infinitum. The longer the TFSS program operated, the need for passengers increased exponentially.

"4. The $1500 entry fee was paid in two checks. One check for $1250 was made payable to TFSS. A second check for $250 was made payable to PMC. The check made payable to TFSS was deposited into a TFSS account, and the money deposited was paid to the pilot of the chart the payor was entering. A pilot on a pyramid which successfully filled all eight passenger positions "cashed out" or exited the system with $10,000. PMC received $250 from every participant when they entered the program.

"5. The offer and sale of participation units in the TFSS system were ostensibly joined with two products: 1) a 'Top Flight Vacation Card' entitling the holder to use of a recreational facility (to be developed later by a subsidiary of PMC) for 20 weeks a year for five years, and 2) a set of motivational tapes. The value of these products was insignificant in comparison to the value of the $1500 entry fee. Participants were encouraged and did, in fact, re-enter the TFSS system multiple times. Multiple sets of vacation cards and motivational tapes were of no additional value to the participants. There is no known or demonstrable market for the products outside the TFSS network.

"6. Ridenhour, on behalf of PMC, offered and sold the participation units in TFSS in meetings or seminars as described in paragraph 1. Interested persons and participants were encouraged to bring other prospects to the

meetings. Prospects were encouraged to join through expectation of a short-term return of $10,000 on a $1500 investment. As a result, over 250 individuals from the Shawnee County area purchased units of participation, and many of these individuals purchased multiple units.

"7. As the program was originally structured, PMC centrally maintained investor charts and kept track of the placement of participants' names and their movement on the various charts. As mentioned, payments to the pilots were originally made to PMC d/b/a TFSS, which then made payment to the 'pilots' cashing out. As the program proliferated, these arrangements broke down and individual participants kept track of the charts, and TFSS checks were endorsed over for direct payment to the 'pilots.'

"8. There is some factual dispute as to the degree of involvement of certain defendants in actively promoting the program and soliciting others to join. However, there is no dispute that all named defendants 1) knowingly purchased participation in the TFSS program with the expectation that they would progress through the levels and ultimately 'cash out,' earning a significant return, 2) knowingly permitted their names to remain in the system on various charts as they progressed through the levels, 3) 'cashed out' as pilots and actually received payments from other participants, and 4) retained such payments."

The district court made the following conclusions of law:

"1. The units of participation in Top Flight Success System (TFSS) are a security within the definition of K.S.A. 17-1252.

"2. Scienter or intent to defraud is not a necessary element to the establishment of a civil conspiracy under Kansas law.

"3. The uncontroverted facts in this case are sufficient to establish that the defendants entered into a civil conspiracy to aid and abet the unlawful sale of securities and the plaintiff's Motion for Summary Judgment should be sustained."

To explain its decision, the district court noted that the term "security," as defined at K.S.A. 17-1252(j), includes "investment contracts," which this court defines as a relationship involving an investment of money in a common enterprise with profits to come from the efforts of others. *Activator Supply Co. v. Wurth*, 239 Kan. 610, 615, 722 P.2d 1081 (1986); *State ex rel. Owens v. Colby*, 231 Kan. 498, 502, 646 P.2d 1071 (1982). The district court stated that it had "little difficulty" in finding that the participation units of TFSS constitute investment contracts and are subject to regulation by the Kansas Securities Act.

The district court rejected defendants' argument that the Commissioner must establish that they participated in this scheme with scienter or intent to defraud. The district court relied upon

this court's definition of "civil conspiracy." Citing *Stoldt v. City of Toronto*, 234 Kan. 957, 967, 678 P.2d 153 (1984), and *Citizens State Bank v. Gilmore*, 226 Kan. 662, Syl. ¶ 7, 603 P.2d 605 (1979), the district court gave the following definition of civil conspiracy: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." The court noted that, while the exact nature and extent of participation in the TFSS scheme is disputed, the undisputed facts established that: (1) Defendants knowingly purchased participation units of TFSS, expecting to progress through the levels and ultimately earn a significant return; (2) defendants permitted their names to remain in the system as they progressed through the levels; (3) defendants received payments from other participants; and (4) defendants retained these payments. The court concluded that these undisputed facts are the elements of a civil conspiracy and establish that defendants aided and abetted the sale of unregistered securities. The district court further held:

"The undisputed facts established that the defendants knowingly associated with a venture which they knew or should have known was unlawful and participated in a way which indicates that they willfully furthered the success of the venture. This constitutes a sufficient showing to entitle the plaintiff to summary judgment concerning the third cause of action for injunctive relief."

The district court sustained the Commissioner's motion for summary judgment and overruled defendants' motion for summary judgment. The court ordered a permanent injunction and disgorgement of profits. Defendants filed a motion to reconsider on April 30, 1990. The district court denied the motion for reconsideration, and this appeal followed the district court's ruling.

Since the granting of summary judgment is challenged in this appeal, we must read the record in the light most favorable to the party who defended against the motion. *McKee v. City of Pleasanton*, 242 Kan. 649, 651, 750 P.2d 1007 (1988). Summary judgment is proper where the only questions presented are questions of law. *Barber v. Williams*, 244 Kan. 318, 319, 767 P.2d 1284 (1989). The record must also reflect that the moving party

is entitled to judgment as a matter of law. *Peoples Nat'l Bank & Trust v. Excel Corp.*, 236 Kan. 687, Syl. ¶ 5, 659 P.2d 444 (1985).

The Commissioner points out that defendants here do not dispute that participation in the airplane pyramid constitutes an investment contract, which is listed in the definitions of security contained in the Act. The district court reached this decision based upon this court's definition of an investment contract contained in *State ex rel. Owens v. Colby*, 231 Kan. at 504. The Commissioner describes the sole question to be decided at both the district court and the appellate court levels as "whether the defendants' conduct in participating in the airplane pyramid and 'cashing out' was sufficient to constitute an act or practice in violation of the Act's proscription against selling unregistered securities." If it does, then relief granted by the district court under K.S.A. 17-1266 is valid; if it does not, the district court's decision must be reversed.

Defendants in this case argue that the district court erred in ordering disgorgement because the appealing defendants did not organize the pyramid and did not directly sell a security to anyone in violation of the Kansas Securities Act, K.S.A. 17-1252 *et seq.* The district court expanded the concept of sale of securities to include individuals who qualify as aiders or abettors or as civil coconspirators. Defendants argue that the district court was wrong in using this expansive interpretation of the Kansas Securities Act and, even if that was proper, that the district court erred in finding that the undisputed facts demonstrated a violation of this expanded concept of a prohibited act. Because nothing in the Act specifically allows the Commissioner to require disgorgement of profits by "passive investors in securities, who themselves committed no wrong," defendants argue the district court erred in imposing liability here.

Although the Commissioner alleged three possible violations of the Act, his motion for summary judgment was based on only a violation of K.S.A. 17-1255, which provides:

"It is unlawful for any person to offer or sell any security in this state, except securities exempt under K.S.A. 17-1261 or when sold in transactions exempt under K.S.A. 17-1262, unless such security is registered by notification under K.S.A. 17-1256 or by coordination under K.S.A. 17-1257 or by qualification under K.S.A. 17-1258."

As previously noted, the district court based its decision upon a single theory of entering into a civil conspiracy to aid and abet the unlawful sale of securities. Although this is the Commissioner's alternative position, he first argues that the defendants were, in fact, sellers of unregistered securities.

In so arguing, the Commissioner attempts to analogize the airplane pyramid to the sale of corporate stock that is regarded as the paradigm of a security. See *Daily v. Morgan*, 701 F.2d 496, 500 (5th Cir. 1983). The seller of corporate stock, who could be either the original issuer or an original purchaser who wants to resell the stock, uses an intermediary underwriter or broker-dealer to sell the interest in the security to a purchaser. The purchaser transfers money through the underwriter or broker-dealer to the seller. The intermediary broker-dealer reduces the amount received by the seller by the commission received for selling the share.

The Commissioner argues that the position of the copilot is analogous here to the seller of common stock. The status of a participant as a crewman, copilot, and even a pilot remains relatively unchanged until the pilot receives payment of $1,250 from each of the eight passengers. The pilot then exits the program and has no further participation rights in it. An entering passenger purchases a security that he or she continues to hold until cashing out as a pilot. The Commissioner asserts that, when the pilot exits the program, the security is not given away or lost but, instead, is sold. Therefore, in selling this interest to another and receiving consideration for transfer of title to the security, the conduct in the airplane pyramid is the equivalent of the sale of corporate stock. Although admitting that transfer of title is difficult to isolate in the airplane pyramid because no clear indicia of title or ownership exists, the Commissioner argues that, in cashing out and exiting the program, the pilot forfeits the right to further participation in exchange for a payment of cash, which causes the pilot to be a seller.

The Commissioner emphasizes that receipt of proceeds from the other participants in the airplane pyramid is the element that delineates the defendants from other people involved in the scheme. He points out that all of the defendants here are pilots

who cashed out at a net profit. The Commissioner argues that straightforward application of the statutory provisions, logic, and policy require a conclusion that such persons are sellers of unregistered securities. We do not agree.

The situation here is distinguishable from a typical sale of corporate stock where an intermediary transfers interest in the security to the purchaser and, in turn, transfers the money from the purchaser back to the seller. The record here contains no evidence that these defendants acted as intermediaries or solicited the purchase. Furthermore, the record does not contain evidence that the copilots or pilots transferred anything to the passengers in return for the payments. The two products transferred to the passengers in these airplane pyramids were apparently done so by the company rather than the pilots and copilots of the pyramid. There is no analogy between usual corporate stock transfers and the situation here. The promoters, not the defendants, are the sellers. Therefore, if the defendants are liable in this action for equitable remedies, it must be as coconspirators or as aiders and abettors.

We first consider if the theory of civil conspiracy can be used to find a "sale" under the Kansas Securities Act, allowing the Commissioner to enforce injunctive and equitable remedies. If so, is the evidence sufficient to support a civil conspiracy theory as to these defendants?

Defendants do not contest that an interest in the airplane pyramid is a security that is not exempt from registration. None of the exemptions of K.S.A. 17-1255 applies. Therefore, any offer or sale of an interest in a pyramid would be an unlawful act under the provisions of K.S.A. 17-1255.

The theories of civil conspiracy and aiding and abetting arise from tort law that imposes vicarious liability for concerted action. Because of the statement of undisputed facts in this case that was the basis for the district court's decision granting summary judgment on behalf of the Commissioner, this court must determine whether the defendants should be held liable for conduct of others who actively solicited passengers into the airplane pyramid. Thus, the question is to what extent these secondary defendants should be held liable for the tortious conduct committed by the primary tortfeasors, who pursued the underlying tortious

activity by actively soliciting participation from the passengers. Neither the district court nor the parties discussed these two theories separately, even though they are distinct. The district court concluded that undisputed facts were sufficient to establish that the defendants entered into a civil conspiracy to aid and abet the unlawful sale of unregistered securities in violation of Kansas law.

As previously noted, Kansas recognizes the five elements of a civil conspiracy to include: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Stoldt v. City of Toronto,* 234 Kan. at 967 (quoting *Citizens State Bank v. Gilmore,* 226 Kan. 662, Syl. ¶ 7). In *Stoldt,* this court noted that conspiracy is not actionable without commission of some wrong giving rise to a cause of action independent of the conspiracy. 234 Kan. at 967.

The parties here do not dispute that four of the five essential elements necessary to establish civil conspiracy are met. First, two or more persons were involved in the airplane pyramid. Second, the object of the participation was to progress through the levels of the pyramid. Third, the parties agreed to, or had a "meeting of the minds" about, the object or course of action. And fourth, damages were incurred by the last individuals who joined the pyramid by paying their $1,500 entry fee, but never cashing out. The disputed element is whether an unlawful overt act was committed by these defendants in furtherance of the conspiracy.

Defendants argue that the mere fact that they were involved in a pyramid with a wrongdoer or tortfeasor does not establish liability. Instead, for civil conspiracy to apply, an agreement must exist to engage in wrongful conduct. Defendants assert that, where an agreement is lawful on its face and is intended to achieve a lawful result, one participant's illegal conduct in furtherance of the business does not taint the entire operation and render all participants liable as coconspirators.

The primary assertion by defendants is that they were mere business associates of a person who unilaterally engaged in illegal

conduct. They claim that their innocent and passive participation in the business was not sufficient to impose civil liability.

In *Mosley v. Unruh*, 150 Kan. 469, 95 P.2d 537 (1939), this court applied the doctrine of civil conspiracy to an unlawful sale of unregistered securities. The statute in effect at that time was similar to the current provisions of 17-1268(a) and (b) because it imposed liability on the sale of an unregistered security and vicarious liability on officers, directors, and agents who participated or aided in the sale. In *Mosley*, the defendant argued that he could not be liable because he did not negotiate or take part directly in the sale of stock and because he was not a director, officer, or agent of the seller. The court rejected this argument and concluded that, if the evidence established that he aided and assisted in consummating the conspiracy, he became liable as a coconspirator. The court stated: "[U]nder the well-established doctrine that an act of one of the conspirators is an act of all he would become in effect a seller within the meaning of the statute. To give the statute a narrower interpretation would open an easy path to its nullification." 150 Kan. at 473. The Commissioner argues that this court rejected limiting the term "seller" to an actual, technical seller and, instead, embraced the civil conspiracy theory in interpreting the meaning of the term "seller."

The Commissioner directs this court to a more recent Oklahoma trial court decision, *Cook v. Pepco, Inc.*, [1987-88 Transfer Binder] Blue Sky L. Rep. (CCH) ¶ 72,694 (Okla. Dist. Ct. 1987), where a credit corporation, Westinghouse, was found liable as a coconspirator with the actual seller of a security for a violation of the Oklahoma Securities Act, Okla. Stat. tit. 71, § 301 (1981), which is the counterpart of K.S.A. 17-1255. Westinghouse refinanced a real estate limited partnership's obligations. This freed lines of credit with local lenders, enabling the limited partnership to continue selling and refinancing and to further dilute the interest of existing investors.

In *Cook*, the court began its analysis by examining whether a conspiracy existed between Westinghouse and the limited partnership. The court first concluded that a conspiracy existed between the limited partnership and its various entities and then considered whether Westinghouse joined and agreed to participate in this already existing conspiracy. The court, which ex-

amined the analysis of a conspiracy employed in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), emphasized that a conspirator can be liable, even though he did not plan or know about the particular overt act causing the injury, if the purpose of the act was to advance the overall objective of the conspiracy. *Cook*, Blue Sky L. Rep. ¶ 72,694 at p. 72,898. After this reference to *Halberstam*, the Oklahoma court noted the decision by this court in *Mosley*, describing it as adding another very important element in the analysis of whether a conspiracy exists. The Oklahoma court was referring in particular to the conclusion in *Mosley* that, in addition to activities that occurred before the overt act, facts and circumstances occurring after the act complained of could be shown to establish the existence of a conspiracy. *Cook*, Blue Sky L. Rep. ¶ 72,694 at p. 72,898.

Having concluded that Westinghouse agreed to join and participate in an ongoing conspiracy to sell unregistered, nonexempt securities, the *Cook* court next considered whether it was proper to consider a conspiracy theory in determining the definition of "seller" in the Oklahoma Securities Act, Okla. Stat. tit. 71 § 408(a)(1) (1981). The Oklahoma Securities Act did not define the term "seller." The court reviewed decisions by federal courts interpreting "seller" under § 12 of the Federal Securities Act of 1933, 15 U.S.C. 77l (1986), upon which the Oklahoma statute was modeled. The court then turned to *Mosley*, again describing it as "[p]robably the most important of the state securities cases to recognize and apply the conspiracy concept to defining a 'seller.' " *Cook*, Blue Sky L. Rep. ¶ 72,694 at p. 72,900. The Oklahoma court concluded that "seller" should be defined to include conspirators, pointing out that conspirator was included within the definition of seller in the better-reasoned authorities on both the state and federal levels since the adoption of the Uniform Act. *Cook*, Blue Sky L. Rep. ¶ 72,694 at p. 72,902.

In *Halberstam*, 705 F.2d 472, the court was required to determine whether Linda Hamilton was civilly liable as a joint venturer and coconspirator for the killing of Halberstam by Welch. Halberstam was killed while Welch burglarized his home. For years Welch was a burglar in the Washington, D.C. area. He and Hamilton lived off the proceeds, which were quite substantial. Hamilton was not directly involved in the burglaries and

claimed that she did not know where Welch went on his evening forays. She did know that Welch had installed a smelting furnace in the garage of their $1,000,000 home to melt gold and silver into bars. She typed transmittal letters for the sale of the ingots to refiners in other states, kept inventories of the antiques sold, and did other general secretarial work for Welch's "business." The buyers of Welch's goods made their checks payable to Hamilton and she deposited them in her bank accounts. 705 F.2d at 475. The trial court found that Hamilton knew full well the purpose of Welch's evening forays and the means he used to acquire their wealth, that she was a willing partner in their criminal activities, and that various acts performed by her were done knowingly to assist Welch in his illicit trade. The district court found her liable for the wrongful death and survivorship damages of Halberstam both on the theory of civil conspiracy and because her assistance was substantial enough to justify civil liability on an aider and abettor theory.

Concerning civil conspiracy, the court noted that, under District of Columbia precedent, liability for civil conspiracy depends on performance of some underlying tortious act. Therefore, conspiracy is not independently actionable but, instead, is a means for establishing vicarious liability for the underlying tort. 705 F.2d at 479. After reviewing decisions from other jurisdictions, the court noted that, where two or more persons jointly commit an on-site burglary, a court would infer a prior agreement to do so, and a violent act occurring within the reasonable scope of such an agreement, particularly when both persons are armed, would allow the imposition of vicarious liability. 705 F.2d at 480. After reviewing additional cases from other jurisdictions, the court noted that the circumstances of each case dictate what evidence may be useful in inferring an agreement. In summary, the court noted that relevant factors in inferring an agreement in a civil conspiracy action included the relationships between the actors and between the actions, such as the proximity in time and place of the acts, and the duration of the actors' joint activity. 705 F.2d at 481. The court noted that once a conspiracy is formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy. It is not necessary for a conspirator to participate actively in or benefit from the wrongful action to

be found liable. In fact, it is not necessary for a conspirator to have planned or to have known about the injurious action as long as the purpose of the tortious act was to advance the overall object of the conspiracy. 705 F.2d at 481.

The court concluded that the trial court was correct in inferring an agreement between Welch and Hamilton based upon the relationship between the parties' acts, the time and place of their execution, and the duration of the joint activity. 705 F.2d at 486. The court noted that, although Hamilton and Welch did not commit the burglaries together, their activities were symbiotic; they were pursuing the same object by different but related means, and their home became the storage and processing base for Welch's criminal activities. 705 F.2d at 486-87. Due to the long-running nature of this five-year scheme, inference of agreement by Hamilton's tacit accord was enough. Furthermore, noting that Hamilton's extensive participation in the profits of the illegal venture might not, by itself, prove an agreement, her unquestioning accession of wealth was consistent with such an agreement. The court upheld the district court's finding that Halberstam's death was an overt act in furtherance of the agreement, and Hamilton could be found liable as a coconspirator. 705 F.2d at 487. Thus, Hamilton's agreement to participate in an unlawful course of action, in which Welch's murder of Halberstam was a reasonably foreseeable consequence of the scheme, was a basis for imposing tort liability on Hamilton under the law of civil conspiracy. 705 F.2d at 487.

Defendants here most strenuously argue that use of the theories of conspiracy or aiding and abetting would be contrary to the recent decision of the United States Supreme Court in *Pinter v. Dahl,* 486 U.S. 622, 100 L. Ed. 2d 658, 108 S. Ct. 2063 (1988). In *Pinter,* the unregistered securities involved were fractional undivided interests in oil and gas leases. Pinter was the oil and gas producer. Dahl was a California real estate broker, who invested $310,000 in the venture and recruited several contacts to invest about $7,500 each. Dahl helped his contacts complete a subscription-agreement form that Pinter had prepared, which stated that the venture interests being sold were not registered under the Securities Act of 1933. When the venture failed, Dahl and his contacts sued Pinter for rescission of investment agree-

ments for the sale of unregistered securities under § 12(1) of the Securities Act of 1933 (15 U.S.C. § 77*l*[1]). Pinter sought to realign Dahl as a third-party defendant.

An issue addressed by the Court was whether Dahl could be deemed a "seller" for purposes of liability under § 12(1). This provision provides, in pertinent part: "Any person who . . . offers or sells a security [in violation of the registration requirement of the Securities Act] shall be liable to the person purchasing such security from him." 15 U.S.C. § 77*l*. The section defines the class of defendants who may be subject to liability as those who offer or sell unregistered securities but noted that the Act did not delineate who may be regarded as a statutory seller. The language of § 12(1) contemplates a buyer-seller relationship like traditional contractual privity at the very least, but, in this case, Dahl was not a seller in the conventional sense and, therefore, could be liable only if § 12(1) liability extended to persons other than the person who passes title. 486 U.S. at 642.

Section 2(3) of the Securities Act of 1933 defines "sale" or "sell" to include " 'every contract of sale or disposition of a security or interest in a security, for value.' " The terms "offer to sell," "offer for sale," or "offer" include " 'every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value.' " 486 U.S. at 643 (quoting 15 U.S.C. § 77b[3]). These definitions are virtually identical to the definitions of these terms contained in the Kansas Securities Act. The Court concluded that Congress intended § 12(1) liability to extend to those persons who solicit securities purchases, but did not intend to impose rescission based on strict liability of a person who urges a purchase when motivation is solely to benefit the buyer. 486 U.S. at 647.

The Court rejected Pinter's argument that broad, remedial goals of the Securities Act justified use of the substantial-factor test. It concluded that the substantial-factor test reaches participants in sales transactions who do not even arguably fit within the definition set out in § 2(3) and would add a gloss to the operative language of § 12(1) that is quite different from its commonly accepted meaning. 486 U.S. at 653-54. The Court remanded the case to the district court for further findings to

determine whether Dahl urged the other purchasers in order to further some financial interest of his own or of Pinter.

The Commissioner counters that defendants have falsely characterized or misperceived the basis of his cause of action as based upon purchasing or investing in securities. Further, the Commissioner argues that these defendants are not innocent purchasers but, instead, knowingly participated in an enterprise to sell participation rights, *i.e.*, securities, to an even greater number of new investors and accepted proceeds from these sales. The act of selling, not purchasing, subjected defendants to legal action.

The Commissioner further argues that *Pinter* holds that a gratuitous offer or solicitation by a nonseller, motivated only by the desire to benefit the buyer and not by any desire to serve the offerees' financial or pecuniary interests, does not subject that person to liability as a "seller" under § 12(1). Although these defendants may not have solicited purchasers, they relied on others to solicit on their behalf. They were directly involved in an enterprise that sold securities, and they were motivated by their own financial interests. The purpose of the pyramid was to pay $1,500, allow PMC to recruit new members, and cash out with $10,000. Thus, the Commissioner concludes that *Pinter* does not preclude or conflict with the district court's finding here that the defendants engaged in acts or practices violating the Act and should be held liable for equitable remedies.

The Commissioner points out that he is attempting to enforce an equitable remedy of an injunction and disgorgement of profits. His cause of action arises under K.S.A. 17-1266, which allows the Commissioner to bring an action "[w]henever it appears to the commissioner that any person has engaged or is about to engage in any act or practice constituting a violation of any provisions of this act." The Commissioner urges a broader interpretation of the statute when merely equitable remedies are sought to be enforced. The unlawful conduct here is based upon K.S.A. 17-1255, which makes it unlawful for a person "to offer or sell any security in this state" that is not exempt or registered. The statute uses the same language as that being interpreted in *Pinter* to preclude a finding of liability under the theories of the substantial-factor test and aiding and abetting.

The United States Supreme Court criticizes the substantial-factor test for not furthering the remedial purposes of § 12(1) because it imposes strict liability rescission on those only tangentially involved with the sale. *Pinter*, 486 U.S. at 650-53. The key distinction is the language in § 12(1), which imposes liability on behalf of the person "purchasing" the security from the seller. That language does not appear in K.S.A. 17-1255. The United States Supreme Court in *Pinter* recognizes that the second clause of § 12(1) narrows the field of potential sellers by requiring the defendant to be the one from whom the plaintiff purchased the security directly. In contrast, K.S.A. 17-1255 is not an enforcement statute but, instead, merely defines the unlawful act. To determine how to penalize the unlawful act, other provisions must be considered, such as K.S.A. 17-1266, to enforce the equitable remedies sought; K.S.A. 1990 Supp. 17-1267, to obtain criminal penalties; and K.S.A. 17-1268, to seek civil liability. Therefore, although the same terms are used in the federal and state statutes to define "sale" or "sell," the basic framework in which the statutes are formulated shows a different approach should be employed.

This court noted in *State v. Hodge*, 204 Kan. 98, 101, 460 P.2d 596 (1969), that the legislative intent and purpose for enacting the Kansas Securities Act was to place the traffic of promoting and dealing in speculative securities under rigid governmental regulation and control to protect investors and to prevent, to the extent possible, the sale of fraudulent or worthless speculative securities. In *State ex rel. Owens v. Colby*, 231 Kan. 498, 501, 646 P.2d 1071 (1982), this court noted that the Kansas Securities Act was patterned after the Uniform Securities Act that, in turn, copied the Federal Securities Act of 1933 (15 U.S.C. §§ 77a *et seq.* [1975]). Because of the web of Uniform Acts throughout the country and their common history and theories in regulating securities, the Kansas Act should be developed by court decisions that are firmly grounded on prior state decisions and upon prior decisions of the federal courts and the courts of our sister states. Because securities acts are remedial legislation, they must be liberally construed. *Hodge*, 204 Kan. at 103. *Cf. Tcherepnin v. Knight*, 389 U.S. 332, 336, 19 L. Ed. 2d 564, 88 S. Ct. 548 (1967).

Here, the district court employed the theory of civil conspiracy in defining the seller of a security. This follows the early decision in *Mosley*, in which this court adopted the use of the conspiracy theory to establish liability as a seller within the meaning of the statute. Even though *Pinter* clearly rejects the use of this theory, we reaffirm its use in defining the seller of a security under the Kansas Securities Act.

Having concluded that the district court did not err in using the theory of civil conspiracy to define the seller of a security, the question arises whether the evidence here supported such a theory to find these defendants liable. Defendants argue that, even if the district court did not err in using the conspiracy theory, the evidence here was insufficient to establish that these defendants committed an overt act in furtherance of the conspiracy.

The district court concluded that these defendants knowingly joined in and associated with a venture that they knew or should have known was unlawful. Their participation indicated a willful furtherance of the success of the venture. The specific facts noted by the district court regarding this conclusion include (1) their knowing purchase of a unit in the pyramid with the expectation to progress and earn a significant return and (2) allowing their names to remain on charts while progressing through the levels of the pyramid until they (3) received and (4) retained money from their participation.

Little evidence supports the finding of an overt act prior to purchase into the program by new passengers. Yet, as was made clear in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983), and *Mosley v. Unruh*, 150 Kan. 469, 95 P.2d 537 (1939), a conspirator can be liable based upon facts and circumstances that occur subsequent to the overt act causing the injury. Thus, receipt of the proceeds paid by new passengers when these defendants cashed out as pilots can be the basis for finding that these defendants committed an overt unlawful act in furtherance of the conspiracy. If the fifth element needed to establish a conspiracy is met, then there is sufficient evidence to find that these defendants conspired to sell an interest in this pyramid scheme, as the term "sell" is defined by K.S.A. 17-1252(h)(1).

Defendants do not contest the district court's finding that these interests in the pyramids are investment contracts. Nor do defendants contest the district court's finding that these investment contracts are unregistered securities. Therefore, defendants' conduct of selling unregistered securities is unlawful and a violation of 17-1255. The Commissioner has the power to enjoin such unlawful conduct and seek equitable relief under 17-1266. We conclude that the district court did not err in concluding that defendants can be liable under 17-1266 for injunctive and equitable relief based upon their involvement as conspirators in the operation of the airplane pyramids.

We next consider if the theory of aiding and abetting can be the basis for finding a "sale" under the Kansas Securities Act and, if so, whether the evidence was sufficient to support use of this theory.

Like civil conspiracy, aiding and abetting is a theory used to impose vicarious liability for concerted action. The section of the Restatement (Second) of Torts dealing with actions of persons in concert lists three subsections, the first two corresponding, respectively, to the theories of civil conspiracy and aiding and abetting:

"For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

"(a) does a tortious act in concert with the other or pursuant to a common design with him [civil conspiracy], or

"(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself [aiding and abetting], or

"(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person." Restatement (Second) of Torts § 876 (1977).

The court in *Halberstam* noted that aiding and abetting includes the following elements:

"(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation." 705 F.2d at 477.

The court in *Halberstam* emphasized the distinction between civil conspiracy and aiding and abetting, noting that, frequently,

many courts and commentators have blurred them. The court noted that the distinctions can make a difference. A civil conspiracy involves an agreement to participate in a wrongful activity, while aiding and abetting focuses on whether a defendant knowingly gave "substantial assistance" to someone who performed wrongful conduct. Thus, under an aiding and abetting theory, the focus is not upon whether the defendant agreed to join wrongful conduct. 705 F.2d at 478.

A qualitative difference exists between proving an agreement to participate in a tortious line of conduct and proving knowing action that substantially aids tortious conduct. In some cases, an agreement cannot reasonably be inferred from substantial assistance or encouragement. In other cases, a conspiracy is difficult to establish if the primary wrong is negligence, but a secondary defendant could substantially aid the negligent conduct. The theory of liability affects who is liable for what, since an aider and abettor is liable for damages caused by the main perpetrator but, absent a finding of conspiracy, the perpetrator is not liable for damages caused by the aider and abettor. 705 F.2d at 478.

In reviewing the case law using the aiding and abetting theory of liability, the court in *Halberstam* noted that many variables enter into the equation of determining how much aid is "substantial aid." Generally, the cases support using the following five factors identified in the Restatement to determine whether the evidence establishes substantial aid: "[T]he nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relation to the other and his state of mind." Restatement (Second) of Torts § 876, Comment *d*, p. 317. See *Halberstam*, 705 F.2d at 483-84. The court in *Halberstam* added a sixth factor: duration of the assistance provided. The court noted that the length of time an alleged aider and abettor has been involved with the tortfeasor affects the quality and extent of their relationship and probably influences the amount of aid provided. The court concluded that it also provided evidence of the defendant's state of mind. 705 F.2d at 484.

The court in *Halberstam* specifically noted that the concept of tortious aiding and abetting has frequently been used in evaluating secondary liability for securities law violations, principally

in the area of fraud. The court concluded that the securities cases support the distinctions drawn between aiding and abetting and civil conspiracy.

Defendants in the present case argue that an aider and abettor must know of a securities violation committed by the principal offender and must substantially assist in the perpetration of that wrong.

The Commissioner counters that nothing in the statute requires imposing a scienter standard in determining whether an individual aided or abetted in the sale of an unregistered security. Defendants were all direct participants in the sales process and aided and abetted the sales by directly receiving payments from new participants who entered the program when the defendants cashed out. Thus, all these defendants have unjustly enriched themselves at the expense of others through the acceptance of proceeds from the unlawful sale of securities. Even though defendants did not actively solicit or recruit, they relied upon others to do this and accepted the benefits of these unlawful acts. The Commissioner argues that it is ironic that defendants could receive and retain sale proceeds but bear no responsibility or accountability for the unlawfulness of the sales.

The Commissioner points out that, in *Robertson v. White*, 635 F. Supp. 851, 866 (W.D. Ark. 1986), which interprets the Arkansas version of K.S.A. 17-1268(b) imposing liability under a private cause of action, the court refused to require willfulness to be established. Strict liability was imposed on directors subject only to a showing that they were unaware that the corporation was engaged in a securities transaction or believed that the securities being sold were properly registered or exempt.

Finally, the Commissioner argues that scienter is not even necessary for criminal prosecution of a principal violator for a willful violation of the registration provision under K.S.A. 1990 Supp. 17-1267. In support, the Commissioner cites *State v. Hodge*, 204 Kan. at 107, and *State v. Puckett*, 6 Kan. App. 2d 688, 698, 634 P.2d 144 (1981), *aff'd* 230 Kan. 596, 640 P.2d 1198 (1982). In *Hodge*, this court noted that "no specific intent is necessary to constitute an offense where one violates the Securities Act except the intent to do the act announced by the statute." 204 Kan. at 107. Thus, "all that is required is proof that the

person acted intentionally in the sense that he was aware of what he was doing." 204 Kan. at 108.

The availability of the aiding and abetting theory was also discussed in *Cook v. Pepco, Inc.*, [1987-88 Transfer Binder] Blue Sky L. Rep. (CCH) ¶ 72,694 (Okla. Dist. Ct. 1987). There, plaintiffs asked the court to grant summary judgment on the grounds that Westinghouse was liable under § 408(b) of the Oklahoma Securities Act, as a person who materially participated or aided in the sale of securities in violation of § 301. The court noted that the statute did not provide guidance about what constitutes material participation or aiding, and that the state and federal courts had diverse opinions on the point. Federal courts have recognized that a person could be a "seller" liable for participating in a sale, even though the person did not have direct contact with the purchaser. Instead, the injury to the plaintiff had to flow directly and proximately from the actions of the person sought to be held liable. This was the "but for" test used in torts. Later, federal courts, believing this proximate cause or "but for" test was too broad, modified it to require that the activity of the person to be held liable was " 'a substantial factor in causing the transaction to take place.' " *Cook*, Blue Sky L. Rep. ¶ 72,694 at p. 72,902. Meanwhile, the state courts approached the issue on an ad hoc basis and were quite liberal in finding someone to be a participant. The *Cook* court concluded that the state courts appear to be gravitating to the "but for" or proximate cause test used originally at the federal level and are specifically rejecting the "substantial factor" test. *Cook*, Blue Sky L. Rep. ¶ 72,694 at p. 72,903.

In *Cook*, Westinghouse argued that it could not be liable for merely providing normal investment and financial services that any other bank or financial institution would provide. While the court recognized the correctness of this principle generally, it concluded that immunity from liability would not continue when the bank or financial institution departed from normal banking or lending functions and actively participated in the affairs of the issuer and in the securities sales themselves. *Cook*, Blue Sky L. Rep. ¶ 72,694 at p. 72,903. The court concluded that Westinghouse was much more involved than simply providing financing, and the broader interpretation of material participation contained

in the "but for" or proximate cause test better served the legislative purposes behind the Oklahoma Securities Act. It rejected use of the "substantial factor" test. The court concluded that the undisputed evidence made clear that Westinghouse materially aided in the sales to the plaintiffs, regardless of whether the court employed the broader "but for" test or the more narrow federal "substantial factor" test. *Cook,* Blue Sky L. Rep. ¶ 72,694 at p. 72,904.

As previously noted, *Pinter v. Dahl,* 486 U.S. 622, 650-53, 100 L. Ed. 2d 658, 108 S. Ct. 2063 (1988), clearly rejects the use of the aiding and abetting theory in interpreting § 12(1) and (2) of the Federal Securities Act of 1933. However, that interpretation does not control in the interpretation of the Kansas Act. We find that the aiding and abetting theory can be used to find an individual liable for the sale of an unregistered security under the Kansas Securities Act. We adopt the "but for" or proximate cause test. Thus, for an individual to be liable for the injury, all that must be established is that the injury flowed directly and proximately from the actions of the person sought to be held liable. We adopt the five factors identified in the Restatement, as well as the sixth factor identified by the *Halberstam* court to determine if the aid is sufficient to establish liability under an aiding and abetting theory. 705 F.2d at 483-84. Applying these six factors in the present case, we first consider the nature of the act involved or encouraged. Here, the passengers were encouraged to buy into the airplane pyramid by paying $1,500. The exchange of this money for an unregistered security was the principal act that caused the violation of the Kansas Securities Act.

The second factor is the amount and kind of assistance given by these defendants. Based upon the facts the parties agreed to below, it must be assumed for purposes of this decision that the defendants did not assist in taking the money from the passengers. The third factor is defendants' absence or presence at the time of the tort. Again, because of the facts agreed to by the parties below, it must be assumed that these defendants were absent at the time the passengers expended their money.

The fourth factor is the relationship of the defendants to the tortious actor. The tortious actor or actors were those who recruited and solicited passengers into the pyramid scheme. Al-

though, presumably, some of these defendants were closely related to the tortious actor, once again those facts are not included in the record agreed to below. Therefore, this factor cannot be considered significant in this case. Fifth, the state of mind of each defendant must be considered. The defendants here sought to obtain substantial profits from the investment of their money. The Commissioner described the defendants' involvement in this pyramid as based upon greed. This factor would appear to weigh heavily against the defendants.

Finally, the sixth factor added by *Halberstam* requires a consideration of the duration of assistance provided. The airplane pyramid began with a multi-level sales program in November and December of 1986. The petition here was filed September 1, 1988. The record does not establish when each of the defendants involved in this case became involved in the pyramid scheme. Because the extent of the pyramid scheme was less than two years, this does not appear to be a heavy factor to be considered in this case.

We conclude that the evidence does not support a finding of liability based upon an aiding and abetting theory.

Defendants next argue that the limited private cause of action under 17-1268 should be employed in determining liability under 17-1266. According to defendants, the grounds for civil liability under 17-1268 contains limited doctrines of conspiracy and aiding and abetting. A private cause of action is created in 17-1268(a) by the purchase of a security from one who "offers or sells" a security in violation of the registration requirements of 17-1254 and -1255. To impose liability, it must be shown that the seller used an untrue statement of material fact or omitted a material fact, and that the seller did not know or, in the exercise of reasonable care, could not have known of the untrue statement or omission. One who is successful under 17-1268(a) may recover consideration paid for the security, plus 15% interest per annum.

Under K.S.A. 17-1268(b), joint and several liability is imposed upon (1) persons who control a seller liable under subsection (a); (2) partners, officers, and directors of a seller; (3) an employee who materially aids the seller; and (4) a broker-dealer or agent who materially aids the sale. Defendants argue that this is the basis for civil liability under the Act and that the Commissioner

should not be allowed to expand this liability by creating an independent basis for liability when the Commissioner files an action under 17-1266. We do not agree.

K.S.A. 17-1268, by its express terms, defines the category of liability for a private cause of action by a purchaser. The limitations of 17-1268(a) and (b), however, do not apply in defining liability under 17-1266 because they have different goals. The purpose of 17-1268 is to provide civil liability to allow recovery by the purchaser, while 17-1266 is a public cause of action for injury and equitable relief to require accountability by the seller.

An action under 17-1266 is a public cause of action to enforce the Act. Only injunctive relief and its ancillary remedy of disgorgement of profits are sought. The profits sought to be disgorged are *net* profits, which allow the defendants to recoup the original $1,500 they invested in the airplane pyramid before returning the excess profits to the commission. The Commissioner disagrees with defendants' characterization of their position as innocent, passive investors who have committed no wrong because they are not liable under 17-1268. As the Commissioner points out, defendants extracted substantial profits taken directly from the pockets of other participants, who sustained substantial losses. The Commissioner further points out that the due diligence defense available under 17-1268(a) against a claim for fraud, and available under 17-1268(b) for vicarious liability, does not apply apart from that statute. Therefore, the due diligence defense is not available against the government cause of action under 17-1266; in any event, it was not asserted by these defendants before the district court.

Defendants' argument that the same liability should be imposed under 17-1268 and -1266 is not supported by the language of the statutes. Clearly, the legislature intended to give the Commissioner the ability to seek injunctive and other equitable relief without imposing an increased liability, not only for the profits secured through the involvement in the securities, but also all the damages incurred by the purchaser, interest, and attorney fees.

Finally, defendants assert that the district court's interpretation of the Kansas Securities Act could not have been anticipated and, therefore, the statute is so vague that persons of common intel-

ligence must guess at the statute's meaning and application. Therefore, the statute is unconstitutionally vague and violates due process guaranteed by the United States Constitution. A statute cannot prohibit conduct in terms so vague that a person of common intelligence must guess at the statute's meaning and application. *Capital Services, Inc. v. Dahlinger Pontiac-Cadillac, Inc.*, 232 Kan. 419, 422, 657 P.2d 36 (1983); *Gumbhir v. Kansas State Board of Pharmacy*, 231 Kan. 507, Syl. ¶ 7, 646 P.2d 1078 (1982), *cert. denied* 459 U.S. 1103 (1983). Defendants assert that they had no idea they were exposed to "civil and criminal prosecution merely because they invested money in a profit making enterprise," and that no common-sense distinction exists between investors who receive a return on investments and investors who do not. Therefore, no person of ordinary intelligence could understand that his or her investment activities could result in criminal prosecution based solely upon the failure of the seller to register the securities, contrary to the assumption and good faith understanding of the buyer.

In *City of Wichita v. Wallace*, 246 Kan. 253, 259, 788 P.2d 270 (1990), this court recognized that, to determine whether an ordinance is void, two inquiries are appropriate: " '(1) whether the ordinance gives fair warning to those persons potentially subject to it, and (2) whether the ordinance adequately guards against arbitrary and discriminatory enforcement.' " (Quoting *State v. Dunn*, 233 Kan. 411, 418, 662 P.2d 1286 [1983].) The void-for-vagueness analysis is based upon a due process requirement that a criminal statute is unconstitutionally vague and indefinite unless its language conveys a sufficiently definite warning of the conduct proscribed when measured by common understanding and practice. 246 Kan. at 258.

We first note that K.S.A. 17-1266 does not impose criminal penalties. Those are set forth at K.S.A. 1990 Supp. 17-1267. The statute here imposes the civil penalties of disgorgement of profits and injunctive relief. The statute, when read in its entirety with other statutes, clearly establishes the conduct that is prohibited. The defendants' prediction that they will be liable for criminal penalties as well as the liability of all persons who lost money in the pyramid schemes is not warranted. The criminal penalties of K.S.A. 1990 Supp. 17-1267 require a showing of willful vio-

lation. The imposition of civil penalties pursuant to K.S.A. 17-1268 requires a showing that the person who offered or sold the security made an untrue statement of material fact or an omission to state a material fact necessary to make the statements made in the light of the circumstances under which they are made not misleading.

In *Guardian Title Co. v. Bell*, 248 Kan. 146, 150, 805 P.2d 33 (1991), we recognized that most challenges for vagueness are against criminal statutes, and a different test for vagueness is applied to noncriminal statutes. We said:

"The same standard is not applied, however, when the statute regulates a business as is applied when the statute is criminal or is regulating a constitutionally protected interest such as free speech. In *In re Brooks*, this court said, 'In determining constitutional challenges for vagueness, greater leeway is afforded statutes regulating business than those proscribing criminal conduct.' *In re Brooks*, 228 Kan. 541, 544, 618 P.2d 814 (1980) (citing *Papachristou v. City of Jacksonville*, 405 U.S. 156, 31 L. Ed. 2d 110, 92 S. Ct. 839 [1972]).

"A common-sense determination of fairness is the standard for determining whether a statute regulating business is unconstitutional for vagueness, *i.e.*, can an ordinary person exercising common sense understand and comply with the statute? If so, the statute is constitutional. *Harris v. McRae*, 448 U.S. 297, 311 n.17, 65 L. Ed. 2d 784, 100 S. Ct. 2671, *reh. denied* 448 U.S. 917 (1980)." 248 Kan. at 150.

In *Guardian Title*, we also stated the general rule applicable to a constitutional challenge of a statute:

"The constitutionality of a statute is presumed and all doubts must be resolved in favor of its validity. Before the statute may be struck down, it must clearly appear the statute violates the constitution. It is the court's duty to uphold the statute under attack, if possible, rather than defeat it, and, if there is any reasonable way to construe the statute as constitutionally valid, that should be done. *State v. Huffman*, 228 Kan. 186, Syl. ¶ 1, 612 P.2d 630 (1980)." 248 Kan. at 149.

We do not find the statutory provisions at issue here to be unconstitutionally vague.

In conclusion, we find that the district court did not commit error in utilizing the theories of aiding and abetting and conspiracy to interpret the term "seller" under the Kansas Securities Act. We further find that sufficient evidence existed in the record to support that these defendants conspired in the unlawful sale of securities and should be held liable for injunctive relief and

disgorgement of profits. We do not find the evidence sufficient to establish that these defendants aided and abetted in the unlawful sale of the securities. Finally, we find that the language of K.S.A. 17-1255 and 17-1266 is not void for vagueness. We therefore conclude that the district court properly granted the Commissioner's motion for summary judgment.

The judgment of the district court is affirmed.