No. 53,596

STATE OF KANSAS, *ex rel.*, CLARK V. OWENS, DISTRICT ATTORNEY OF SEDGWICK COUNTY, *Appellant,* v. MORTON COLBY and BIG 3 AUTO PRODUCTS, INC., *Appellees.*

(646 P.2d 1071)

Appeal filed June 11, 1982.

*E. Dwight Taylor,* deputy district attorney, argued the cause, and *Robert T. Stephan,* attorney general, *Clark V. Owens,* district attorney, and *Mark A. Vining,* assistant district attorney, were with him on the brief for the appellant.

*Joseph O. Giaimo,* of Giaimo & Vreeburg, of Forest Hills, New York, and *Jim Lawing,* of Wichita, argued the cause and were on the brief for the appellees.

The opinion of the court was delivered by

FROMME, J.: The State appeals from the dismissal of charges following a preliminary hearing. K.S.A. 22-3602(b)(1). The defendants, Big 3 Auto Products, Inc., its president, Morton Colby, and two sales representatives were charged with three violations of the Kansas Securities Act. These charges were for selling

securities without prior registration (K.S.A. 17-1255), failing to register as brokers (K.S.A. 17-1254), and making untrue statements of material fact (K.S.A. 17-1253). The lower court dismissed these charges after finding the agreement to sell and purchase mini warehouses and automobile repair and tune-up parts did not constitute an "investment contract" controlled by the provisions of the Kansas Securities Act.

We are confronted with a single issue. Did the agreement used by the defendants constitute an "investment contract" controlled by the Kansas Securities Act?

The contract in question provided:

"This agreement made and entered into this _____ day of _____ 19___, by and between Big 3 Auto Products, Inc., hereinafter designated as 'Big 3' and NAME _____

ADDRESS_____ PHONE NUMBER_____

CITY _____ STATE_____ ZIP CODE_____

hereinafter designated as the 'Distributor', upon the following terms and conditions:

"1.  Big 3 agrees to supply the above named Distributor with the following items:
   A.  Uni-Sets, Point Sets, Condensers, Rotors, Distributor Caps, Spark Plug Wire sets, Spark Plugs, PCV Valves, Gas Filters, Air Breather Elements, Modules, Coils, Air Filters, 10 Mini Warehouses.

"2.  Big 3 acknowledges receipt of $1000.00 representing payment only to the locator who, solely at Distributor's request obtains 10 Service Station and/or Repair Shop accounts at $100.00 per account, approved as to sales volume and location by the distributor in writing, in the following non-exclusive area:

"3.  [Here was set forth numbers and description of various repair and tune-up parts which the distributor was to receive from Big 3 listing the cost for such items and totaling $5,766.57.]
   C.  Amount due upon acceptance by Big 3
                    $10,131.67
        Payments to be by Certified check or Cashiers check made payable only to Big 3 Auto Products, Inc.
   D.  The balance due for delivery of items in paragraph 3 'B' shall be at the then current wholesale price, less the deposits. In the event that the Distributor decides not to order delivery of the aforementioned items, Distributor shall not be liable for any balance due in excess of prepaid deposits.
   E.  All shipments shall be made at F.O.B. nearest Big 3 Distribution center.

"4.  Distributor is engaged in an independent business and is solely responsible for his own employees, taxes, insurance, and the acts and omissions, of his agents and employees. As such, Distributor is not and shall not represent that it is an agent for Big 3, AC Delco, or Motorcraft; nor use the name Big 3, AC Delco or Motorcraft, AC Delco's or Motorcraft's trademarks and/or designs and markings in advertising, catalogs, promotional literature or other material without the prior written consent of Big 3, AC Delco, or Motorcraft, as the case may be.

"5. Distributor is not required to pay any fee to Big 3, as Big 3 does not sell or grant any rights to engage in a business but hereby sells only automotive parts to Distributor at the total sum set forth in Paragraph '3'. Distributor is free to engage in any other business and sell any other products and is not required to operate his business under any marketing plan or system prescribed by Big 3.

"6. Any dispute, controversy or claim arising out of or relating to this agreement or the breach thereof, shall be settled by the American Arbitration Association, 140 W. 51st Street, New York, N.Y. 10020.

"7. This agreement shall be effective only upon written acceptance by an Officer of Big 3 and is for an initial period of one year commencing from the delivery of merchandise at locations and shall remain in effect each year thereafter unless terminated by the Distributor.

"8. This agreement comprising of 2 pages is complete within itself and may be changed only in writing signed by the Distributor and an Officer of Big 3. The Distributor has read and understands the contents of this agreement and agrees that there are no warranties, representation, guarantees of profits or sales volume, grants of exclusive territories, promises or statements, expressed or implied, in connection therewith other than stated in writing herein. Big 3 makes no earning claims. Big 3 will not and does not represent that it will provide any service or assistance other than specified in this agreement. This agreement is made in and shall be interpreted according to the laws of the State of Florida and shall be binding upon Big 3 and shall go into effect only when signed by an Officer of Big 3."

The foregoing agreement was signed at the end by the distributor, and an acceptance was noted by affixing the signature of an officer of Big 3.

There was a second agreement denominated "Repurchase Agreement" available to those who were to become distributors. We need not set forth that agreement. Suffice it to say, under this agreement, if the distributor desired to terminate the distribution agreement at the end of the initial period Big 3 agreed to buy back the inventory then on hand at original purchase prices.

After the preliminary hearing in these criminal cases, the trial court made the following findings on which it based dismissal:

"1. Big 3 Auto Products, Inc., referred to herein as Big 3, is an auto parts wholesaler in Florida and Morton Colby is its President.

"2. On or about January 29, 1981, Wayne Brock, Wichita, entered into a contract (State's Exhibit 4) with Big 3 to purchase from it various auto parts for distribution at various locations in and around Wichita, Kansas, the nature and extent of this contract is evidenced by State's Exhibits 1 through 6, inclusive.

"3. At the time Mr. Brock signed the contract, he intended to make a profit between what he paid Big 3 for the parts and what he charged to the independent garages and auto repair shops where 'mini-warehouses' had been placed by an independent contractor, called a 'locator,' who Big 3 had procured at the request of Mr. Brock.

"4. Under the contract Mr. Brock signed with Big 3, he paid $1,000.00 for the locator's services. He relied on the judgment of the locator, who placed ten mini-warehouses in locations which the locator recommended, but he had the right to install mini-warehouses wherever he desired and to remove any warehouses from the places the locator had recommended.

"5. Neither Morton Colby nor Big 3 ever registered to sell securities in the State of Kansas.

"6. Mr. Brock did not have any expertise as an auto parts jobber, although he had bought and sold new and used cars with a local auto dealer.

"7. To carry out the intent of the contract, Mr. Brock would have had to make a material effort toward the project if he were to realize a profit.

"8. Defendant Big 3 furnished Mr. Brock a suggested price list showing what he would pay Big 3 and indicating prices that he in turn could charge to dealers and the prices that the dealers could then charge their customers.

"9. The enterprise of Mr. Brock did not become profitable.

"10. The same facts comprising the Brock transaction with defendants Colby and Big 3 generally existed with respect to the contracts entered into between those two defendants and Gary and Mary Iverson and Glen Brichacek and the contract negotiations entered into between defendants and Ruth Hoadley.

"11. Therefore, the Court concluded that as a matter of law, State's Exhibit 4 is not a security as contemplated by the Kansas Securities Act, K.S.A. 17 (252 C.J.). Accordingly, the twelve counts charging defendants Big 3 and Morton Colby with violating the Kansas Securities Act should be dismissed."

The Kansas Securities Act is patterned after the Uniform Securities Act which is itself a copy of the Federal Securities Act of 1933. As a part of the web of the Uniform Acts throughout the nation and because of the common history and theories behind both the state and federal experience in the field of securities regulation, the Kansas Act should be developed by court decisions which are firmly grounded on prior state decisions and upon prior decisions of the federal courts, and the courts of our sister states.

In formulating the "proper" test for "investment contracts," it is useful to reflect upon this court's earlier decision on the proper definition of another term found in subsection (j) of K.S.A. 17-1252, "evidence of indebtedness." See State v. Hodge, 204 Kan. 98, 460 P.2d 596 (1969). The Hodge case should set the tone of the present case as it demonstrates the position Kansas has taken in the regulation of speculative securities.

In Hodge, the matter was submitted upon stipulated facts. The State sought to prosecute Mr. Hodge on charges of violation of the securities act. Mr. Hodge sold two promissory notes each entitled "Receipt in Lieu of Promissory Contract." That note, called a receipt, obligated the Tomal Company to issue to the

purchaser a promissory contract in the face amount of twice the value of the receipt. The court found that under the stipulated facts, this "evidence of indebtedness" was a security as contemplated by 17-1252(j). The court went on to discuss the securities act and the possible purpose the legislature sought to serve by its enactment. As pointed out in *Hodge* the purpose of the Kansas Securities Act is to place the traffic of promoting and dealing in speculative securities under rigid governmental regulation and control to protect investors, thereby preventing, so far as possible, the sale of fraudulent and worthless speculative securities.

The *Hodge* court reviewed the prior Kansas decisions and the federal decisions and approved of the remedial nature of the securities acts. The court in addition to a reference to the definition of "security" found in 17-1252(j), cited another definition of "security" in the following language:

"Another definition of the term 'security' which has received judicial approval is the investment of money with the expectation of realizing a profit through the efforts of persons other than the investor. [Citations omitted.]" 204 Kan. at 103.

Speculative securities include those, the value of which materially depends upon proposed or promised future promotion or development, rather than on present tangible assets or conditions.

Under the Kansas Securities Act, 17-1252(j), the definition of a "security" includes the term "investment contract."

In *S.E.C. v. Howey Co.*, 328 U.S. 293, 90 L.Ed. 1244, 66 S.Ct. 1100 (1946), the United States Supreme Court reviewed a case involving the sale of units of orange groves in Florida. The facts in that case showed that the Howey Company had offered to investors units of orange groves and also sold service contracts for the cultivation, harvesting and marketing of the units and the fruit. It was clear that land sales contracts and service contracts were part and parcel of the investment and that the success or failure of the investment rested upon the shoulders of the Howey Company. The investors were found to be persons of little or no experience with citrus trees who were attracted by the expectation of substantial profits. The court reviewed the law relating to its definition of "investment contracts" and stated:

"The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others. If that test be satisfied, it is immaterial whether the enterprise is speculative or nonspeculative or whether there is a sale of property with or without intrinsic value." 328 U.S. at 301.

One does not have to read too far to discover that the last portion of the foregoing definition has given rise to some questions. The requirement, that the profit in "investment contracts" come *solely* from the efforts of others, has been under occasional attack by courts recognizing the economic realities of investments, and this has resulted in modifications of the test in some jurisdictions. See *Silver Hills Country Club v. Sobieski,* 55 Cal. 2d 811, 13 Cal. Rptr. 186, 361 P.2d 906 (1961).

A later case critical of the *Howey* test, which directly challenged the "solely from efforts of others" requirement, is *State v. Hawaii Market Center, Inc.,* 52 Hawaii 642, 485 P.2d 105, 47 A.L.R.3d 1366 (1971). That case concerned a "founder-member" agreement in which persons became founder-member distributors by purchasing either a sewing machine or a cookware set for an inflated price. An investor's membership entitled him to earn money in several ways, all of which were dependent on activities of others. The *Hawaii Market* court criticized the *Howey* test and went on to state that the basic economic reality of a security transaction is the subjugation of the investor's money to the risks of an enterprise over which he exercises no managerial control.

Much has been written concerning investment contracts under securities acts. See Annot., Blue Sky Laws - Investment Contracts, 47 A.L.R.3d 1375; Annot., Securities - "Investment Contract," 3 A.L.R. Fed. 592; 69 Am. Jur. 2d, Securities Regulation - Federal §§ 25, 26 and 28, pp. 610-614; 69 Am. Jur. 2d, Securities Regulation - State §§ 27, 28, pp. 1089-90; Comment, *What is a Security? Howey, Turner Enterprises, and Franchise Agreements,* 22 Kan. L. Rev. 55 (1973); and Comment, *Definition of a "Security,"* 12 Tex. Tech. L. Rev. 911 (1981).

Generally, the term "security," which has no precisely defined legal definition aside from statutory provisions, has reference to a written instrument. Such instruments are usually for the payment of money or to evidence a debt. They are more than a mere promise of the debtor to pay a general liability and have as collateral to such instruments pledges of property or some additional obligation. By common usage, however, the term has acquired a much broader meaning. It is now generally used to refer to instruments for the payment of money, or evidencing title or equity, with or without some collateral obligation, and which

are commonly dealt in for the purpose of financing and investment. Instruments, whether secured or unsecured, which are used for the purpose of financing enterprises and promoting a distribution of rights in or obligations of such enterprises, and which are designed as a means of investment, are termed "securities." *State v. Hodge,* 204 Kan. at 103.

In Kansas we are favored with a general statutory definition of the term "security" in the Act, as heretofore paraphrased. The language defining a security in 17-1252(*j*) presently under consideration is similar to the language of the federal act. 15 U.S.C.A. § 80a-2(a) (36).

It has been said of the federal securities act that it is remedial in nature, to be liberally construed, and that in appraising contracts for the purpose of determining the applicability of the statute, courts readily look through form to discover the real nature of the transaction; that labels affixed by the parties are of little moment. *State v. Hodge,* 204 Kan. at 103.

To determine whether a particular financial relationship constitutes an "investment contract" within the meaning of K.S.A. 17-1252(*j*), the test to be applied is whether the contractual arrangement involves an investment of money in a common enterprise with profits to come from the efforts of others. This test is to be applied in light of the economic realities of the particular contractual arrangement, rather than accepting the terminology employed by the parties in the investment contract.

After examining the above test, which we now adopt, to determine whether the present arrangement falls into the category of an investment contract covered by the Kansas Securities Act, and looking through the form of the document used by the defendants in authorizing distributorships to discover the real nature of the transaction, we are of the opinion the agreement does not constitute an investment contract as envisioned by those who enacted the statute.

The present contractual arrangement is clearly distinguishable from the pyramid scheme described in *State, ex rel., v. Koscot Interplanetary, Inc.,* 212 Kan. 668, 512 P.2d 416 (1973). It does not fit into the category of a franchise agreement. We have not embraced the "risk capital" test discussed in *Silver Hills Country Club v. Sobieski,* 58 Cal. 2d 811. In arriving at a decision to affirm we consider the following facts:

Big 3's parent corporation, Wayco Distributing Corporation, began selling automotive brake shoes to customers throughout the United States in early 1976. Eventually it branched into the sale of other auto parts, such as water pumps, alternators, voltage regulators, starter drives and spark plugs. Big 3 was created as a subsidiary in 1979 for the purpose of selling a "tune-up" line of parts. *No auto parts are identified by the Wayco or Big 3 name.* Big 3 does not manufacture parts. It sells brand name parts as well as nonbrand name parts on a wholesale basis to its customers who also sell them wholesale to garages and service stations. Big 3 has no trademark, logo, symbol, or other identifiable sign. It does not advertise its products but limits its advertising to the solicitation of wholesaler customers such as Mr. Brock.

The Big 3 sales system is simple and perhaps unique in eliminating several layers of middlemen in getting auto parts to its customers who sell to repair shops. Generally, Big 3 eliminates the major distributor, warehouse distributor, and the warehouse jobber, the middlemen who add to the cost of auto parts. It does so by buying directly from the manufacturer or, in the case of Ford, GM and Chrysler, from their major distributors. Big 3 then sells to its customers, sometimes on a direct shipment basis from Big 3's supplier, who is paid by Big 3. The wholesaler-customer, in turn, sells at a marked-up wholesale price, generally on consignment to his or her own customers, usually garages and service stations. Big 3 stays competitive by buying in large volume directly from manufacturers which on order ship direct to distributors. This eliminates substantial warehousing costs, utilizes independent commission sales representatives to solicit wholesaler-customers, and enables sales on a cash or C.O.D. basis.

There is no tie-in linking the wholesaler-customer's business success to Big 3. Big 3 is in the business only of selling auto parts as a wholesaler to smaller wholesalers. In other words, there is no common enterprise upon which the Big 3 customer relies. While it is true that if Big 3 were to go bankrupt the customers would lose some benefit on account of future sales orders, that is true of any business. For example, Chrysler auto dealers face a problem if the manufacturer, Chrysler Motor Products, eventually goes into bankruptcy, or if its cars do not sell as well as competitive cars. But, that does not put the auto dealer into the same enter-

prise as Chrysler Motor Products. Paragraphs 4 and 5 of the agreement make that clear.

Big 3 argues that it is obvious that the wholesaler-customer's success is entirely dependent on his or her own efforts. Even the State admits that there were no set prices which the investors were to charge their customers and each investor was free to choose the number of hours he wanted to work each week and the time necessary to service each of the accounts. The investor could hire help if he chose to. He could add additional locations. He could sell repair parts out of the back of his truck. He has a great deal of discretion. Use of the locator service was optional. Mr. Brock, however, testified it was not made entirely clear to him when he entered into the agreement that locator service was optional. Mr. Brock further testified that his locator was in town for two days and he "basically dumped" the cabinets any place anyone would take one. It doesn't appear any great amount of managerial effort was undertaken by Big 3 in finding the locations.

There may have been misrepresentations made by Big 3 in its contacts while locating and contracting with distributors. However, fraud and misrepresentation, if any, did not subject Big 3 to criminal action under the Kansas Securities Act because the contractual arrangement agreed on did not constitute an investment contract controlled by the Kansas Securities Act.

The order of dismissal is affirmed.