IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 124,611

STATE OF KANSAS,
*Appellee*,

v.

DAVID W. MOELLER,
*Appellant.*

SYLLABUS BY THE COURT

1.

Kansas precedent establishes that the death of a criminal defendant during the appeal of his or her conviction does not automatically abate the appeal but may render some issues moot.

2.

Under the doctrine of stare decisis, once a point of law has been established by a court, that point of law will generally be followed by the same court and all courts of lower rank in subsequent cases where the same legal issue is raised. Even so, this court will overturn precedent, no matter how longstanding, if it is clearly convinced the rule of law was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent.

3.

As used in the securities fraud statute, K.S.A. 17-12a501(3), the words "fraud" and "deceit" carry their ordinary meanings.

4.

Under the Kansas Uniform Securities Act, K.S.A. 17-12a101 et seq., an investment contract is a type of security. An investment contract consists of four elements: (1) an investment of money; (2) in a common enterprise; (3) with the expectation of profits; and (4) from the efforts of others.

5.

For purposes of an investment contract as defined in K.S.A. 17-12a102(28)(D) under the Kansas Uniform Securities Act, K.S.A. 17-12a101 et seq., a common enterprise may be shown either by horizontal commonality—an enterprise common to a group of investors—or by vertical commonality—an enterprise common to the investor and the seller, promoter, or some third party.

Review of the judgment of the Court of Appeals in an unpublished opinion filed June 30, 2023. Appeal from Jefferson District Court; CHRISTOPHER ETZEL, judge. Oral argument held March 27, 2024. Opinion filed June 7, 2024. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Kristafer R. Ailslieger*, deputy solicitor general, argued the cause, and *Derek Schmidt*, former attorney general, and *Kris W. Kobach*, attorney general, were with him on the briefs for appellee.

The opinion of the court was delivered by

WALL, J.: In *State v. Hollister*, 300 Kan. 458, Syl. ¶ 1, 329 P.2d 1220 (2014), this court held that the death of a criminal defendant during the appeal of his or her conviction does not automatically abate the appeal but may render some issues moot. And the doctrine of stare decisis directs us to adhere to this precedent in subsequent cases raising

the same legal issue. Nevertheless, we may depart from established precedent under certain conditions. This appeal requires us to decide whether stare decisis warrants our continued adherence to *Hollister*. We conclude it does.

David Moeller was convicted of securities fraud after finagling an acquaintance out of $9,500 by promising an investment opportunity in a new business that never materialized. Moeller appealed, arguing there was insufficient evidence to support his conviction. But he died during the pendency of his appeal. Applying *Hollister*, the Court of Appeals held Moeller's death did not render his appeal moot. The panel thus addressed the merits of Moeller's sufficiency challenge and affirmed his conviction and sentence. *State v. Moeller*, No. 124,611, 2023 WL 4278212, at *2-5 (Kan. App. 2023) (unpublished opinion). Defense counsel petitioned for review, arguing that we should overrule *Hollister* and that the panel erred in concluding his conviction was supported by sufficient evidence.

Today, we continue to adhere to *Hollister* under the doctrine of stare decisis. For one, we are not clearly convinced *Hollister* was originally erroneous. Furthermore, we are not clearly convinced that more good than harm would come from departing from *Hollister*. *Hollister* strikes a fair balance between the competing interests in a criminal appeal, and any alternative approach would raise problems of its own.

We also hold the State presented sufficient evidence to support Moeller's conviction for securities fraud under K.S.A. 17-12a501(3). Moeller argues the State failed to prove he violated that statute because the trial evidence does not show he engaged in "an act [of] . . . fraud or deceit" upon the victim, nor does it show the transaction between Moeller and the victim involved a security as that term is defined by law. K.S.A. 17-12a501(3); see also K.S.A. 17-12a102(28) (defining "security"). But Moeller's argument essentially asks us to reweigh the evidence, which appellate courts do

3

not do. When viewed in the light most favorable to the State, the evidence was sufficient to support Moeller's conviction. We thus affirm Moeller's conviction and sentence.

FACTS AND PROCEDURAL BACKGROUND

Diane Brunner gave Moeller a check for $9,500 to invest in a new business that would manufacture and sell the "Blade Caddy," a carrying case for saw blades. There was no new business. Instead, Moeller used the money to pay off a personal financial obligation, and he never fully reimbursed Brunner. After a bench trial, Moeller was convicted of securities fraud, sentenced to 24 months' probation, and ordered to pay $5,500 in restitution to Brunner and $513 in court costs and fees. Moeller appealed, arguing there was insufficient evidence to support his conviction. The evidence supporting his conviction will be discussed in more detail in Issue II along with the merits of his sufficiency challenge.

After both parties filed their opening briefs, the Court of Appeals issued an order indicating it "ha[d] become aware of information suggesting that [Moeller] died after filing this appeal." The Court of Appeals directed both defense counsel and the State to investigate whether Moeller had died and to inform the court of the results of their investigations. In his response, defense counsel provided an order from the district court terminating Moeller's probation because of his death. Defense counsel also disclaimed the ability to conduct a more extensive investigation in a timely manner and thus he did not definitively confirm or deny Moeller's death. The State responded by providing confirmation of a death certificate for Moeller. 2023 WL 4278212, at *2.

In its decision, the panel found Moeller had died, but also chastised defense counsel for not conducting a more extensive investigation and not providing a definitive answer on whether Moeller had died. 2023 WL 4278212, at *2. Nonetheless, the panel held the appeal was not moot under *Hollister* because the only issue Moeller raised—

4

sufficiency of the evidence to support his conviction—could exonerate him. *Moeller*, 2023 WL 4278212, at \*2; see *Hollister*, 300 Kan. at 458-59 (court may address issues that may exonerate defendant). And the panel affirmed Moeller's convictions. *Moeller*, 2023 WL 4278212, at \*3-5.

Defense counsel petitioned for review, asking us to revisit the abatement rule in *Hollister*. He also petitioned for review of the panel's holding that sufficient evidence supported Moeller's conviction.

We granted review, and we heard oral argument on March 27, 2024. Jurisdiction is proper. See K.S.A. 20-3018(b) (providing for petitions for review of Court of Appeals decisions); K.S.A. 60-2101(b) (Supreme Court has jurisdiction to review Court of Appeals decisions upon petition for review).

ANALYSIS

I.   *We Adhere to* Hollister *Under the Doctrine of Stare Decisis*

The main issue in this appeal is whether we should continue to adhere to *Hollister*. Defense counsel asks us to overrule that decision and adopt the doctrine of abatement ab initio. Under that doctrine, "a criminal defendant's death abates the appeal and all proceedings from the beginning of the criminal case." *Hollister*, 300 Kan. at 465. Thus, in jurisdictions that follow the doctrine, the appellate court not only abates the appeal but also vacates the conviction and remands the case for the district court to dismiss the indictment. See, e.g., *United States v. Libous*, 858 F.3d 64, 66 (2d Cir. 2017). Alternatively, defense counsel asks us to allow the appeal to continue as to all issues after substitution of a party for the deceased defendant.

5

The State responds that we should continue to adhere to *Hollister*. It argues *Hollister* is sensible and allows both the defendant and the State to vindicate important rights. The State also adamantly opposes adoption of the doctrine of abatement ab initio, arguing the doctrine harms both the public generally and crime victims specifically.

### A. *Standard of Review and Relevant Legal Framework*

Because this issue involves consideration of a court policy developed through court precedent, our review is unlimited. See *State v. Hilton*, 295 Kan. 845, 849, 286 P.3d 871 (2012) ("A court policy necessarily comes about through prior opinions of the court, *i.e.*, the mootness doctrine developed through court precedent. Accordingly, our review is unlimited."); *State v. May*, 293 Kan. 858, 862, 269 P.3d 1260 (2012) ("To the extent our decision involves . . . the interpretation and application of prior court precedent, we are resolving questions of law and, thus, exercising unlimited review.").

Under the doctrine of stare decisis, "'once a point of law has been established by a court, that point of law will generally be followed by the same court and all courts of lower rank in subsequent cases where the same legal issue is raised.'" *Crist v. Hunan Palace, Inc.*, 277 Kan. 706, 715, 89 P.3d 573 (2004). "Stare decisis—while not a 'rigid inevitability'—serves as a 'prudent governor on the pace of legal change.'" *McCullough v. Wilson*, 308 Kan. 1025, 1035, 426 P.3d 494 (2018). Even so, "this court will overturn precedent, no matter how longstanding, if it is '"clearly convinced [the rule of law] was originally erroneous or is no longer sound because of changing conditions and that more good than harm will come by departing from precedent."'" 308 Kan. at 1036.

To address the abatement question, we first review the historical development of our abatement policy before conducting the stare decisis analysis.

B. *Development of Our Abatement Policy*

In two cases issued in the early years of Kansas' statehood, this court declined to abate a criminal appeal after the defendant's death. See *State v. Ellvin*, 51 Kan. 784, Syl. ¶ 1, 33 P. 547 (1893); *State v. Fisher, Adm'r*, 37 Kan. 404, 15 P. 606 (1887). In both cases, the defendant's death did not abate the judgment of costs and this court considered the merits of the appeal. *Ellvin*, 51 Kan. at 789; *Fisher*, 37 Kan. 404.

Many years later, in *State v. Jones*, 220 Kan. 136, 551 P.2d 801 (1976), the court revisited its abatement policy. It explained that while many other jurisdictions had adopted the doctrine of abatement ab initio, Kansas had historically allowed appeals to continue, citing *Fisher* and *Ellvin*. *Jones*, 220 Kan. at 137. The *Jones* court also reasoned it was in the interests of both the defendant's family and society to review the appeal on its merits:

> "A defendant's conviction is at this stage in midair. The judgment of conviction is not final due to the pendency of an appeal. While death moots the sentence, renders impossible a new trial, and abates any fine imposed, the matter of costs remains. The state and the defendant (not to mention his family) have endured the strain, the tribulation and the expense of trial and appeal. Oftentimes rights other than those of an individual defendant are involved. The right to inherit, or to take by will or otherwise, may be affected. K.S.A. 1975 Supp. 59-513. The family of the defendant and the public have an interest in the final determination of a criminal case." 220 Kan. at 137.

*Jones* thus held that the deceased defendant's appeal "should be adjudicated upon the merits." 220 Kan. at 137. See also *State v. Salts*, 288 Kan. 263, 265, 200 P.3d 464 (2009) (defendant's death 12 days after his notice of appeal was filed did not render his direct appeal moot); *State v. Burnison*, 247 Kan. 19, 32, 795 P.2d 32 (1990) ("[I]n Kansas the death of a defendant does not abate his direct appeal as it is in the interest of the public that the issue[s] raised on appeal be adjudicated upon the merits.").

7

Then our course changed slightly in *State v. Karson*, 297 Kan. 634, 304 P.3d 317 (2013). There, the court again reiterated that a defendant's death does not automatically abate an appeal. But it also signaled that not all issues survive the death of an appellant, stating: "The issues *may* be fully reviewed and adjudicated when doing so is in the public interest or when it is in the interest of the appellant's family and estate." (Emphasis added.) 297 Kan. 634, Syl. ¶ 1. The *Karson* court opted to address the merits of the appeal because the issues raised presented matters of public importance. 297 Kan. at 638.

The next year, in *Hollister*, we solidified the approach suggested in *Karson*—that not all issues raised in a criminal appeal would be addressed after a defendant's death. We recognized *Karson*'s approach was "consistent with this court's broader approach to addressing moot issues in other contexts." *Hollister*, 300 Kan. at 467. So, based on mootness jurisprudence, *Hollister* identified several criteria for appellate courts to apply in determining which issues to address when a criminal defendant dies during the pendency of an appeal. "[A]n appellate court should consider whether an issue: (1) is of statewide interest and of the nature that public policy demands a decision, such as those issues that would exonerate the defendant; (2) remains a real controversy; or (3) is capable of repetition." 300 Kan. at 467. And *Hollister* held "[o]nly issues meeting one of these criteria should be addressed." 300 Kan. at 467.

Applying those criteria in *Hollister*, the court addressed only the defendant's challenge to the sufficiency of the evidence because it was the only issue that might exonerate him—that is, an issue that remained a real controversy. We held the defendant's other claims of trial error would not exonerate him; rather, a finding of error "would require a remand for a new trial . . . but a new trial would be impossible given [the defendant's] death." 300 Kan. at 467. We also held the other issues were too case-specific to settle any issues of statewide interest or capable of repetition. 300 Kan. at 467.

8

Then-Justice Luckert dissented. She acknowledged Kansas courts had traditionally held that the death of a criminal defendant during the pendency of an appeal does not automatically abate the appeal, but she argued the flaw in this approach is that "without the defendant there is no one to pursue the appeal." 300 Kan. at 472 (Luckert, J., dissenting). She also noted that other jurisdictions allowing appeals to continue provide for substitution, but Kansas had no procedural mechanism to substitute a party for the deceased defendant in a criminal appeal. 300 Kan. at 473 (Luckert, J., dissenting). Then-Justice Luckert would have "follow[ed] the lead of the federal courts and most other courts and appl[ied] the doctrine of abatement *ab initio*." 300 Kan. at 474 (Luckert, J., dissenting).

These decisions confirm the court's long-standing commitment to the rule that criminal appeals do not automatically abate upon the death of the defendant. See *Karson*, 297 Kan. at 637. And over 10 years ago in *Karson* and *Hollister*, we refined this approach by adding certain criteria to limit the issues an appellate court may address out of mootness concerns. See *Hollister*, 300 Kan. at 467.

Defense counsel now asks us to overrule *Hollister* and adopt a different approach to handling criminal appeals after a defendant's death. To do so, however, we would need to be clearly convinced *Hollister* was originally erroneous or unsound due to changing conditions and that more good than harm would come from departing from established precedent. *McCullough*, 308 Kan. at 1036. Moeller has not persuaded us that any of these conditions have been met.

C.   *Stare Decisis Warrants Our Continued Adherence to* Hollister

As part of our stare decisis analysis, we must first consider whether *Hollister* was originally erroneous or is no longer sound due to changing conditions and then assess

9

whether more good than harm would come from overruling the precedent. See *McCullough*, 308 Kan. at 1036.

1. *We Are Not Clearly Convinced* Hollister *Was Originally Erroneous or Is Unsound Due to Changing Conditions*

Defense counsel urges us to overrule *Hollister* because he believes it creates ethical and practical problems for attorneys appointed to represent criminal defendants on appeal. Counsel claims "the application of *Hollister* by the Court of Appeals in this case and others requires appointed counsel to conduct factual investigation regarding their own clients (even though appointed counsel lacks investigative resources) and report potentially adverse facts to the appellate court." According to counsel, the panel's order directing him to investigate Moeller's death created a conflict of interest between him and his client and required him to disclose potentially confidential communications. And he claims these problems stem from *Hollister* because under that decision, the defendant's death is now an "adverse fact" because it may prevent an appellate court from addressing all issues raised by the defendant on appeal.

It is unclear to us whether the Court of Appeals' order created an ethical dilemma for defense counsel. We note that the Kansas Rules of Professional Conduct (KRPC) allow (but do not require) an attorney to reveal information relating to the client's representation in response to a court order. See KRPC 1.6(b)(4) (2024 Kan. S. Ct. R. at 333); see also KRPC 1.6, comment 25 (2024 Kan. S. Ct. R. at 338). If an attorney believes a court order requires him or her to reveal information protected from disclosure, the attorney may assert that claim in his or her response. KRPC 1.6, comment 23 (2024 Kan. S. Ct. R. at 337). And in the event of an adverse ruling, the attorney may seek review. KRPC 1.6, comment 23 (2024 Kan. S. Ct. R. at 337). This procedure was not followed in this case.

10

In any event, the argument is a red herring as it pertains to a stare decisis analysis. Any purported ethical dilemma arises from a Court of Appeals practice that is not mandated by *Hollister*. *Hollister* did not impose an obligation on criminal defense attorneys to investigate and report on a client's death. Nor does *Hollister* compel courts to order criminal defense attorneys to do so. Thus, we are unpersuaded that the purported ethical conflict created by the panel's order establishes that *Hollister* was originally erroneous.

Furthermore, *Hollister* is consistent with our mootness jurisprudence. We have held that "'[a]n appellate court may sometimes elect to entertain issues which, although moot, are subjects of real controversy and include issues of statewide interest and importance'" or are "capable of repetition." *Smith v. Martens*, 279 Kan. 242, 244, 106 P.3d 28 (2005). The criteria identified in *Hollister* accurately reflect this jurisprudence.

We recognize the *Hollister* rule does not answer the question of who is left to pursue the appeal. As then-Justice Luckert pointed out, a criminal defendant's death "leaves no one as the appellant and [the defendant's] attorney without a client." *Hollister*, 300 Kan. at 473 (Luckert, J., dissenting). And because the attorney-client relationship is one of agency and ordinarily ends with the client's death, the attorney generally lacks authority to continue to act on behalf of the deceased defendant. See *State v. Dickens*, 214 Kan. 98, 102, 519 P.2d 750 (1974). Nor does the defendant's death "transform the State— as representative of the public—into an appellant." *Hollister*, 300 Kan. at 473 (Luckert, J., dissenting). And "Kansas statutes do not provide a criminal procedure for substituting a party in a criminal defendant's appeal." 300 Kan. at 473 (Luckert, J., dissenting).

But the question of who has authority to pursue a criminal appeal after the defendant's death is a separate question from whether *Hollister*'s abatement rule was originally erroneous or unsound due to changing legal conditions. In fact, some states that allow substitution in criminal appeals also apply the same criteria in *Hollister* to decide

11

which issues remain justiciable controversies. See *State v. Reed*, 248 Ariz. 72, 80-81, 456 P.3d 453 (2020) (allowing substitution in criminal appeal after defendant's death but also applying criteria identified in *Hollister*). So, resolving the open question of who has authority to pursue a criminal appeal after the defendant's death would not answer the first prong of our stare decisis framework.

Moreover, *Hollister* has not proven to be unworkable, notwithstanding the unresolved question of who is left to pursue the appeal. See *State v. Sims*, 308 Kan. 1488, 1504, 431 P.3d 288 (2018) (this court is "not constrained to follow precedent when 'governing decisions are unworkable or are badly reasoned'"). Kansas courts have applied *Hollister* in several cases, allowing some appeals to proceed as to certain issues while finding others entirely moot. Compare *State v. Belt*, 305 Kan. 381, 382, 381 P.3d 473 (2016) (addressing some of defendant's issues on appeal after defendant's death but dismissing others as moot); *State v. Lingenfelter*, No. 121,953, 2021 WL 1836441, at *2- 4 (Kan. App. 2021) (unpublished opinion) (same), with *State v. Baker*, No. 119,832, 2020 WL 1649850, at *7 (Kan. App. 2020) (unpublished opinion) (dismissing all issues raised by defendant as moot after defendant's death); *State v. Cada*, No. 111,440, 2016 WL 367999, at *2 (Kan. App. 2016) (unpublished opinion) (same). And neither the appellate courts nor the parties in those cases identified any difficulty in applying *Hollister*.

As for changing conditions, there have been no developments in our mootness jurisprudence that would undermine the rationale of *Hollister*. See, e.g., *State v. Roat*, 311 Kan. 581, 590, 466 P.3d 439 (2020) (recognizing Kansas courts will address issues that are otherwise moot but are capable of repetition and present concerns of public importance). And Kansas has always been among a minority of states that allow criminal appeals to continue after a defendant's death. See *Hollister*, 300 Kan. at 466 (recognizing that "Kansas and a few other states" allow appellate courts to consider the merits of the appeal after a defendant dies); see also *State v. Al Mutory*, 581 S.W.3d 741, 752-55

12

(Tenn. 2019) (collecting cases). Thus, there has been no trend away from our current approach that would suggest *Hollister* is now unsound.

### 2. *We Are Not Clearly Convinced More Good Than Harm Would Come from Overruling* Hollister

We are also not clearly convinced more good than harm would come from overruling *Hollister* because *Hollister* strikes a fair balance between the numerous competing interests at stake in a criminal appeal. See *McCullough*, 308 Kan. at 1036 (court may depart from precedent if clearly convinced more good than harm would come from overruling it). For example, some states dismiss criminal appeals upon the death of the defendant, leaving the conviction intact. See *Commonwealth v. Hernandez*, 481 Mass. 582, 590 n.14, 118 N.E.3d 107 (2019) (listing cases). But this approach disregards the defendant's right to appeal. And while that right is statutory and not constitutional, see *State v. Rocheleau*, 307 Kan. 761, 763-64, 415 P.3d 422 (2018), it is nevertheless "an integral part of the judicial process." *Hollister*, 300 Kan. at 474 (Luckert, J., dissenting); see also *Al Mutory*, 581 S.W.3d at 754 (recognizing "state courts have allowed appeals as of right from a conviction to continue because they find the right to appeal is far too valuable to be lost at death").

A defendant's family will often have an interest in the outcome of an appeal as well. Criminal convictions and sentences are often accompanied by a financial component, such as restitution, and these financial obligations may fall upon the defendant's estate in the event of the defendant's death. See *State v. Carlin*, 249 P.3d 752, 764 (Alaska 2011). "The right to inherit, or to take by will or otherwise, may be affected" by the criminal conviction. *Jones*, 220 Kan. at 137; see K.S.A. 2023 Supp. 59-513. And the defendant's family may also want to vindicate the name and reputation of their deceased relative. See *State v. Makaila*, 79 Haw. 40, 45, 897 P.2d 967 (1995). Simply dismissing the appeal after the defendant's death would disregard these interests.

13

Abating ab initio, on the other hand, would serve the interests of the defendant and the defendant's family, but it would disregard the interests of other parties. For instance, abating ab initio would ignore the State's interest in maintaining the defendant's conviction. See *State v. Gleason*, 349 So. 3d 977, 981 (La. 2022) (recognizing "the state has an interest in preserving a presumptively valid conviction"); *Makaila*, 79 Haw. at 45 (same). And vacating a potentially valid conviction could have negative consequences for victims not only emotionally but also financially when restitution is ordered as part of the judgment. See *Al Mutory*, 581 S.W.3d at 749; see also *Wheat v. State*, 907 So. 2d 461, 463 (Ala. 2005) (noting trend away from abatement ab initio likely to continue as "*the courts and public begin to appreciate the callous impact such a procedure necessarily has on the surviving victims of violent crime*").

We believe our current approach as exemplified in *Hollister* ably balances the competing interests of all the relevant parties. By not simply dismissing the appeal, the defendant and the defendant's family still have an opportunity to challenge the conviction and, in some cases, to ensure the constitutionality of criminal proceedings. See, e.g., *Karson*, 297 Kan. at 638 (addressing deceased defendant's claim that a law enforcement search violated the defendant's state and federal constitutional rights because the claim presented question of public importance). And by not abating ab initio, our current approach honors the interests of the State and any victims.

Defense counsel argues more good than harm would come from overruling *Hollister* in favor of the doctrine of abatement ab initio. We recognize abatement ab initio is the rule in federal courts, at least as to appeals as of right. *Libous*, 858 F.3d at 66. And about a third of our sister states and the District of Columbia follow the doctrine. See *People v. Schaefer*, 208 Cal. App. 4th 1283, 1287, 146 Cal. Rptr. 3d 497 (2012); *People v. Johnson*, 499 P.3d 1045, 1047 (Colo. 2021); *Lee v. United States*, 257 A.3d 1023, 1024 (D.C. 2021); *People v. Robinson*, 187 Ill. 2d 461, 464, 719 N.E.2d 662 (1999); *State v.*

*Holbrook*, 261 N.W.2d 480, 481 (Iowa 1978); *State v. Carter*, 299 A.2d 891, 895 (Me. 1973); *State v. Burrell*, 837 N.W.2d 459, 470 (Minn. 2013); *State v. Mott*, 569 S.W.3d 555, 556 (Mo. Ct. App. 2019); *State v. Campbell*, 187 Neb. 719, Syl., 193 N.W.2d 571 (1972); *State v. Poulos*, 97 N.H. 352, 354, 88 A.2d 860 (1952); *People v. Nowell*, 80 Misc. 3d 689, 695, 195 N.Y.S.3d 413 (Sup. Ct. 2023); *State v. Dixon*, 265 N.C. 561, 562, 144 S.E.2d 622 (1965); *State v. Marzilli*, 111 R.I. 392, 393, 303 A.2d 367 (1973); *State v. Clark*, 260 N.W.2d 370, 370-71 (S.D. 1977); *State v. Free*, 37 Wyo. 188, 188, 260 P. 173 (1927).

But there has been a marked trend away from abatement ab initio among the states in recent years. See *Nowell*, 80 Misc. 3d at 695-706  (recognizing trend away from abatement ab initio but ultimately adhering to binding precedent adopting doctrine); *Al Mutory*, 581 S.W.3d at 748 n.7, 750. Since we issued *Hollister*, five states have explicitly overruled precedent applying the doctrine of abatement ab initio. See *Gleason*, 349 So. 3d at 982-83; *Hernandez*, 481 Mass. at 599; *Payton v. State*, 266 So. 3d 630, 640 (Miss. 2019); *Al Mutory*, 581 S.W.3d at 750; *Majors v. State*, 465 P.3d 223, 225 (Okla. Crim. App. 2020). And one state declined to adopt the doctrine as a matter of first impression. *State v. Isaak*, 988 N.W.2d 250, 253-54 (N.D. 2023).

Indeed, many courts consider the doctrine to be out-of-step with modern trends toward recognizing victims' rights and providing restitution. See *Al Mutory*, 581 S.W.3d at 749; *Payton*, 266 So. 3d at 639. Kansas has enacted constitutional and statutory protections to victims in criminal proceedings. See Kan. Const. art. 15, § 15(a); K.S.A. 74-7333 (entitled "[b]ill of rights for victims of crime"). And Kansas statutes generally require sentencing courts to impose restitution as a part of a defendant's sentence. K.S.A. 21-6604(b)(1); K.S.A. 21-6607(c)(2). We are not persuaded abatement ab initio is consistent with these constitutional and statutory protections.

Defense counsel also suggests more good than harm would come from overruling *Hollister* and following those states that allow a criminal appeal to continue after the defendant's death with substitution of another party. As we noted above, the question of who has authority to pursue a criminal appeal after the defendant dies is separate from the question of whether our position on abatement is correct.

Moreover, many of these states have procedural rules that allow for substitution of a party during the pendency of an appeal. See, e.g., *Fiveash v. State*, 458 S.W.3d 774, 775 n.1 (2015); *Makaila*, 79 Haw. at 45; *Surland v. State*, 392 Md. 17, 36, 895 A.2d 1034 (2006); *Payton*, 266 So. 3d at 640-41; *State v. McGettrick*, 31 Ohio St. 3d 138, 142, 509 N.E.2d 378 (1987); *State v. Webb*, 167 Wash. 2d 470, 478, 219 P.3d 695 (2009). Kansas currently has no such rule. See *Hollister*, 300 Kan. at 473 (Luckert, J., dissenting) (noting "Kansas statutes do not provide a criminal procedure for substituting a party in a criminal defendant's appeal").

To overcome this obstacle, defense counsel argues K.S.A. 2023 Supp. 60-225 provides for substitution in criminal appeals. That statute allows for substitution after a party's death in civil cases. K.S.A. 2023 Supp. 60-225(a). And the statute has been applied in civil appeals. See *Seal v. Seal*, 212 Kan. 55, 56, 510 P.2d 167 (1973); *Long v. Riggs*, 5 Kan. App. 2d 416, 418, 617 P.2d 1270 (1980), *overruled on other grounds by Graham v. Herring*, 297 Kan. 847, 305 P.3d 585 (2013).

Even though K.S.A. 2023 Supp. 60-225 is a rule of civil procedure, defense counsel notes we have "held in the past that the code of civil procedure may apply in criminal proceedings when the code of criminal procedure provides no contrary provisions." *State v. Edwards*, 299 Kan. 1008, 1016, 327 P.3d 469 (2014). And under K.S.A. 22-3606, the Legislature has provided that the statutes and rules governing civil appeals apply to criminal appeals.

16

We question the wisdom of applying a rule of civil procedure to this criminal appeal because doing so may create more problems than it solves. For instance, could the State move for substitution under the statute even if no other party wished to prosecute the appeal? Would the substituted party have a right to appointed counsel? And who would pay for the attorney's services if there were insufficient funds in the defendant's estate? We believe these contingencies are best addressed through the rule-making or legislative process rather than by judicial fiat. See *Hernandez*, 481 Mass. at 599-600 (declining to interpret rule of civil procedure as allowing substitution in criminal appeals because "[g]iven the practical considerations involved . . . the Legislature would be the appropriate body to adopt that particular approach").

In the end, *Hollister* ably synthesizes a long-established court policy on the treatment of criminal appeals after a defendant's death with our mootness jurisprudence. It also establishes an appropriate equilibrium among the opposing interests involved in a criminal appeal. *Hollister* was issued 10 years ago and in that time the decision has not proven to be difficult to administer or otherwise unworkable. We are not convinced that *Hollister* was originally erroneous or unsound due to changing conditions. And we are not persuaded that defense counsel's proposed alternatives would be superior to our current approach to abatement issues. Thus, we continue to adhere to *Hollister* under the doctrine of stare decisis.

II. *There Was Sufficient Evidence to Support Moeller's Conviction*

Next, Moeller argues there is insufficient evidence to support his conviction for securities fraud under K.S.A. 17-12a501(3). This issue is not moot because a potential finding of insufficient evidence would be the first step toward exonerating Moeller, and under *Hollister* and our mootness doctrines, exoneration remains a "case or controversy"

17

even after death. See 300 Kan. at 468. But before addressing the merits of Moeller's sufficiency challenge, we will review some additional relevant facts and identify the relevant legal framework applicable to Moeller's challenge.

### A. *Additional Facts*

Moeller had a business buying surplus inventory from stores and reselling it for a profit. He arranged to buy $9,500-worth of carpet remnants from Carpet Factory and resell them. Moeller later claimed the carpet remnants he picked up were not the ones he originally agreed to buy so he did not pay for them. Carpet Factory reported the incident to law enforcement, and the State charged Moeller with felony theft.

While Moeller's theft charges were still pending, Moeller spoke with one of his employees, Mike Maxie, and Maxie's ex-girlfriend, Diane Brunner. Brunner had just cashed out her IRA and was looking to invest the money somewhere. Brunner understood "investing" to mean "make money off my money."

Moeller told Brunner about his business idea "Blade Caddy," which she assumed was a carrying case for a saw blade. Moeller said he needed a few investors to get the business started. While Moeller did not specifically ask Brunner for money, he told Brunner, "[Y]ou have to put in money for this investment if you want to invest in this." He explained there would not be any profits for a few months while he got the business off the ground, but then he would repay any money she invested along with some of the profits. Brunner thought it sounded like a good idea, but she was not sure she could trust Moeller because she did not know him very well. She asked Maxie, and he said he thought it was a legitimate investment. Brunner wrote Moeller a check for $9,500 and wrote "Blade Caddy" on the memo line. Brunner wrote the check expecting to get her money back plus some of the profits based on how well the product sold.

18

The next day, Moeller cashed Brunner's check and used the proceeds to obtain a cashier's check to pay the outstanding balance Moeller owed to Carpet Factory. After Moeller repaid Carpet Factory, his theft charge was dismissed.

Over the next several months, Moeller repaid Brunner about $3,000 but only after Brunner pestered him about the status of her investment. She eventually reported the incident to the Kansas Securities Commission, and Special Agent Chad Entsminger investigated the complaint. During a phone call, Moeller told Entsminger that Brunner had not made an investment; rather, the two had made a personal deal based on an idea he had that could make them both some money. He denied the deal had anything to do with Blade Caddy, and he claimed he had had nothing to do with Blade Caddy for 20 years. In a later phone call, Moeller told Entsminger that Brunner had "invested" but Moeller had paid back some of Brunner's money. Moeller also mentioned there were two other investors, but he did not specify what Brunner and the other investors had invested in.

The State charged Moeller with securities fraud, or in the alternative, theft by deception. The case went to a bench trial. The State called several witnesses including Brunner and Special Agent Entsminger. Moeller also testified in his own defense. He explained he had originally patented the Blade Caddy in 1989 but the patent was now expired. He denied asking Brunner to invest in Blade Caddy. Rather, he said he told Brunner he would like to borrow some money, but he never told her what the money was for. He also claimed the money was just a loan, and he had paid Brunner back in full.

The district court found Moeller guilty of securities fraud under K.S.A. 17-12a501(3). On appeal, the Court of Appeals affirmed Moeller's conviction, concluding it was supported by sufficient evidence. *Moeller*, 2023 WL 4278212, at *3-5.

19

Moeller now challenges the panel's holding. He claims the evidence does not show he acted with "fraud or deceit" within the meaning of the securities fraud statute. He also argues his transaction with Brunner was simply a loan and did not involve a security.

B.   *Standard of Review and Relevant Legal Framework*

"When a criminal defendant challenges the sufficiency of the evidence used to support a conviction, an appellate court looks at all the evidence 'in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt.'" *State v. Harris*, 310 Kan. 1026, 1030, 453 P.3d 1172 (2019). An appellate court generally will not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. *State v. Pepper*, 317 Kan. 770, 777, 539 P.3d 203 (2023).

To the extent this issue also requires interpretation of statutes, that is a question of law subject to unlimited review. *State v. Stoll*, 312 Kan. 726, 736, 480 P.3d 158 (2021). Additionally, Kansas has adopted the 2002 Uniform Securities Act, and we "often look to decisions from other courts as persuasive authority when interpreting uniform laws." *State v. Lundberg*, 310 Kan. 165, 170-71, 445 P.3d 1113 (2019).

C.   *Moeller's Conduct Meets the Definition of "Fraud or Deceit"*

Moeller was convicted of violating K.S.A. 17-12a501(3), which provides, "It is unlawful for a person, in connection with the offer, sale, or purchase of a security, directly or indirectly . . . to engage in an act, practice, or course of business that operates or would operate as a fraud or deceit upon another person."

Moeller first argues the evidence fails to show he engaged in "an act [of] . . . fraud or deceit" within the meaning of K.S.A. 17-12a501(3) because the evidence does not

20

show he said anything to Brunner that misled or deceived her in order to obtain her money. The panel rejected this argument, holding "Moeller's diversion of Brunner's 'investment' to take care of his personal financial obligations amounted to . . . [an] act . . . of 'fraud' or deceit'" under the statute. *Moeller*, 2023 WL 4278212, at \*3.

Moeller bases his argument on the interpretation of the words "fraud or deceit" in K.S.A. 17-12a501(3). When interpreting statutes, our guiding principle is that the Legislature's intent governs if that intent can be ascertained. *State v. Strong*, 317 Kan. 197, 203, 527 P.3d 548 (2023). "In ascertaining legislative intent, courts begin with the statute's plain language, giving common words their ordinary meaning. If, however, the statute's language is ambiguous, courts may consult canons of construction to resolve the ambiguity." 317 Kan. at 203.

The Kansas Uniform Securities Act (the Act), K.S.A. 17-12a101 et seq., provides only that the terms "fraud," "deceit," and "defraud" as used in the Act are not limited to common law deceit. K.S.A. 17-12a102(9). This suggests the words "fraud" and "deceit" as used in K.S.A. 17-12a501(3) bear their "'ordinary, contemporary, common meaning[s]'" rather than a specific legal meaning. *Midwest Crane & Rigging, LLC v. Kansas Corporation Comm'n*, 306 Kan. 845, 851, 397 P.3d 1205 (2017). And we have recognized dictionaries are a good source for the ordinary meanings of words. 306 Kan. at 851. Black's Law Dictionary defines "fraud" as "[a] knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment" and "deceit" as "[t]he act of intentionally leading someone to believe something that is not true; an act designed to deceive or trick." Black's Law Dictionary 802, 510 (11th ed. 2019).

Here, the evidence shows Moeller's actions were designed to deceive or trick Brunner. Brunner testified Moeller told her about the Blade Caddy business as an investment opportunity, and she wrote a check to him for the purpose of investing in that

21

business. Her testimony is corroborated by the check, on which she had written "Blade Caddy" on the memo line. Both witness testimony and documentary evidence show Moeller did not invest that money in the Blade Caddy business. Instead, he used Brunner's money to repay Carpet Factory. In turn, Moeller's theft charges were dismissed. Furthermore, there was no evidence Moeller devoted any time or money to the Blade Caddy business besides securing a patent over 20 years earlier. Viewing this evidence in a light most favorable to the State, a rational fact-finder could conclude Moeller engaged in an act that operated as a fraud or deceit on Brunner.

Moeller claims the evidence is insufficient because he never said anything to Brunner about Blade Caddy. He also highlights Brunner's testimony that she would not have invested if Maxie had not told her it was a good investment. But these arguments are just invitations to reweigh the evidence, which appellate courts do not do. *Pepper*, 317 Kan. at 777. Furthermore, even if Moeller had not made any fraudulent or deceitful representations to induce Brunner's investment at the outset, his act of cashing Brunner's check and using the money to pay off a personal financial obligation provides sufficient evidence of a deceitful act under K.S.A. 17-12a501(3). And while Brunner may not have agreed to hand over her money without Maxie's approval, that fact does not render Moeller's conduct any less fraudulent or deceitful.

    D.  *The Transaction Between Brunner and Moeller Involved the Sale of a Security in the Form of an Investment Contract*

Moeller next challenges the sufficiency of the evidence proving his fraudulent conduct occurred "in connection with the offer, sale, or purchase of a security." K.S.A. 17-12a501. The State charged Moeller with committing securities fraud in connection with the sale of a security in the form of an investment contract. See K.S.A. 17-12a102(28) (defining "security" to include investment contracts). And the Court of Appeals held the evidence was sufficient to show Moeller's transaction with Brunner was

an investment contract. *Moeller*, 2023 WL 4278212, at *4-5. Moeller challenges the panel's conclusion, arguing the evidence shows Brunner loaned him the money for an unspecified purpose, not in connection with a security, i.e., an investment contract.

For purposes of the Act, K.S.A. 17-12a102(28)(D) defines an "investment contract" as "an investment in a common enterprise with the expectation of profits to be derived primarily from the efforts of a person other than the investor." This statutory definition essentially codifies a four-part test this court adopted to determine if a particular financial transaction constitutes an investment contract. See *Activator Supply Co. v. Wurth*, 239 Kan. 610, 617, 722 P.2d 1081 (1986) (citing *State ex rel. Owens v. Colby*, 231 Kan. 498, 646 P.2d 1071 [1982]) ("investment contract" requires: [1] an investment of money; [2] in a common enterprise; [3] with the expectation of future profits; and [4] from the efforts of others.); see also *Colby*, 231 Kan. at 502-04 (adopting test for investment contracts under federal securities law set forth in *S.E.C. v. Howey Co.*, 328 U.S. 293, 301, 66 S. Ct. 1100, 90 L. Ed. 1244 [1946]). Thus, to establish that Moeller's fraud occurred in connection with a security, the State needed to establish the existence of an investment contract by proving the following elements: (1) Brunner made an investment; (2) in a common enterprise; (3) with the expectation of profits; and (4) those profits were to be derived primarily from the efforts of another.

Moeller challenges the sufficiency of the evidence supporting the first two elements of an investment contract—that is, whether Brunner made an investment and whether that investment was in a common enterprise. But we agree with the Court of Appeals' conclusion that the State presented sufficient evidence as to both elements.

First, the evidence was sufficient to show Brunner made an investment. The term "investment" is not statutorily defined, but we have interpreted the term in the context of the Act to mean that an "investor must commit his assets to the enterprise in such a

23

manner as to subject himself to financial loss." *Wurth*, 239 Kan. at 617 (citing *Hector v. Wiens*, 533 F.2d 429, 432 [9th Cir. 1978]).

Moeller likens his case to *State v. Hood*, 255 Kan. 228, 873 P.2d 1355 (1994). There, a man entered a written contract to purchase a percentage of his cousin's interest in a restaurant. The cousin then used the money from the sale for personal purposes. The Kansas Office of the Securities Commissioner concluded the two men had entered an investment contract and the cousin's conduct constituted securities fraud. But this court disagreed, explaining nothing in the terms of the written contract specified that the money from the sale was to be invested in the restaurant or to become part of its capital. 255 Kan. at 232-33.

Moeller claims that like *Hood*, he did not tell Brunner he would use the money for Blade Caddy. But this argument views the evidence in a light most favorable to Moeller, contrary to our standard of review. According to Brunner, Moeller told her he needed investors to get the Blade Caddy business off the ground and she would need to put money in if she wanted to invest in the business. She wrote "Blade Caddy" in the memo line of the check she gave to Moeller. And Special Agent Entsminger testified Moeller used the word "invest" when describing Brunner's act of giving Moeller money. Viewing this evidence in a light most favorable to the State, the evidence establishes that Brunner invested in Moeller's fabricated startup.

Moeller also argues Brunner did not make an "investment" because she did not subject herself to financial loss. He relies on Brunner's testimony indicating she did not intend to lose money and would not have invested in Blade Caddy if she thought she might lose money. But viewed in a light most favorable to the State, this testimony suggests Brunner expected Blade Caddy to be profitable—it does not prove she was not at risk of financial loss. See *S.E.C. v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003) (even though investors gave money to pay phone management program hoping to yield

24

financial gains and program offered buyback option, investors still subjected themselves to financial loss because they took on risk that individual phones would not be profitable, or the entire enterprise would fail).

Second, Moeller argues the State failed to show his transaction with Brunner involved a common enterprise. K.S.A. 17-12a102(28)(D) defines a "common enterprise" as "an enterprise in which the fortunes of the investor are interwoven with those of either the person offering the investment, a third party or other investors."

As Moeller notes, courts have recognized a common enterprise may be shown in two different ways: (1) horizontal commonality—an enterprise common to a group of investors; and (2) vertical commonality—an enterprise common to the investor and the seller, promoter, or some third party. See *Hocking v. Dubois*, 885 F.2d 1449, 1455 (9th Cir. 1989). Some jurisdictions require horizontal commonality to establish a common enterprise while other jurisdictions recognize both horizontal and vertical commonality. Compare *Stenger v. R.H. Love Galleries, Inc.*, 741 F.2d 144, 146 (7th Cir. 1984) ("This Circuit has strictly adhered to a 'horizontal' test of common enterprise, under which multiple investors must pool their investments and receive pro rata profits."), with *S.E.C. v. Infinity Group Co.*, 993 F. Supp. 321, 322 n.1 (E.D. Pa. 1998) (noting several federal circuit courts recognize vertical as well as horizontal commonality).

We have not had occasion to interpret the statutory definition of "common enterprise" to determine the test for commonality under the Act. But the plain language of K.S.A. 17-12a102(28)(D) defines "common enterprise" to include both vertical and horizontal commonality. See *Strong*, 317 Kan. at 203 (when interpreting statutes, courts first look to plain language). Vertical commonality is encompassed in the phrase "an enterprise in which the fortunes of the investor are interwoven with those of . . . the person offering the investment [or] a third party." K.S.A. 17-12a102(28)(D). And horizontal commonality is encompassed in the phrase "an enterprise in which the

25

fortunes of the investor are interwoven with those of . . . other investors." K.S.A. 17-12a102(28)(D). And the statute's use of the phrase "either . . . or . . ." indicates the presence of just one type of commonality is sufficient to satisfy this element. See Garner, Garner's Modern English Usage 383 (5th ed. 2022) ("*either . . . or . . .*" frames two alternatives). Thus, the State can prove the existence of a common enterprise under the Act by proving either horizontal commonality or vertical commonality. See *State v. Brown*, 295 Kan. 181, 196-97, 200, 284 P.3d 977 (2012) (if statute lists options within a means, State need only provide sufficient evidence of one option to sustain conviction).

And here, there is sufficient evidence of vertical commonality—that is, an enterprise in which Brunner's fortunes were interwoven with Moeller's. See K.S.A. 17-12a102(28)(D); see also *Hocking*, 885 F.2d at 1455 (vertical commonality is shown by an enterprise common to the investor and the seller, promoter, or some third party). Brunner testified Moeller said he needed the money to get his Blade Caddy business started and once product began to sell, Brunner would receive a share of the profits. Thus, Brunner's prospect for financial gain was dependent on the success of Moeller's business. Because there is sufficient evidence of vertical commonality, the State provided evidence sufficient to establish the "common enterprise" element under K.S.A. 17-12a102(28)(D), and we need not address whether there was sufficient evidence of horizontal commonality.

Moeller insists the evidence shows the money Brunner gave him was a loan and not an investment. And he testified to this fact at trial. But Brunner repeatedly testified that she "invested" or made an "investment" in Blade Caddy and that Moeller said she would receive her money back plus a portion of the profits. She also testified that Moeller said it would take several months for the business to get off the ground before it would generate profits for distribution. And when Moeller spoke with Special Agent Entsminger, Moeller did not describe the transaction as a loan. Rather, he said Brunner had "invested." Resolving all questions of credibility in favor of the State, as we must do,

26

this evidence would support a finding that Brunner made an investment in a common enterprise. See *State v. Kuykendall*, 264 Kan. 647, 651, 957 P.2d 1112 (1998) (On sufficiency review, "all questions of credibility are resolved in favor of the State.").

Moeller does not contest the sufficiency of the evidence supporting the final two elements of an investment contract—that Brunner expected to profit and that the profit would come from the efforts of others. And our independent review of the record confirms there was sufficient evidence to support these elements.

As a result, the State presented sufficient evidence to sustain Moeller's conviction for securities fraud under K.S.A. 17-12a501(3).

Judgment of the Court of Appeals affirming the judgment of the district court is affirmed.

\* \* \*

LUCKERT, C.J., dissenting: For the reasons more fully explained in my dissent in *State v. Hollister*, 300 Kan. 458, 472-74, 329 P.3d 1220 (2014), I dissent. Regardless of the policy reasons for the majority's position, without a statutory process for continuing a criminal case after the defendant's death, Kansas appellate courts lack authority—or a statutory process—to consider this appeal.